**HYDRAULIC EXCHANGE AND REPAIR, INC., and Paul Titzer, Appellants–Defendants,**

v.

**KM SPECIALTY PUMPS, INC., and KM Specialty Systems, Inc., Appellees–Plaintiffs.**

No. 87A04–9705–CV–174.

Court of Appeals of Indiana.

Jan. 30, 1998.

J. William Brunner, Boonville, for Appellants–Defendants.

Reed S. Schmitt, Scott M. Stratman, Frick Powell Whinrey Cravens & Schmitt, Evansville, for Appellees–Plaintiffs.

## OPINION

NAJAM, Judge.

### STATEMENT OF THE CASE

On March 5, 1997, KM Specialty Pumps, Inc., and KM Specialty Systems, Inc., (collectively "KM") filed its complaint against Hydraulic Exchange and Repair, Inc., ("HER") and Paul Titzer for Breach of Contract, Tortious Interference, Damages and Permanent Injunction. The following day, KM filed a Motion for Preliminary Injunction which sought to enjoin Titzer and HER from using KM's customer and pricing information or from contacting KM's customers. After a hearing, the trial court entered its Temporary Restraining Order and Order for Preliminary Injunction. HER now brings this interlocutory appeal pursuant to Indiana Appellate Rule 4(B)(3).[1]

We affirm in part, reverse in part and remand.[2]

### ISSUES PRESENTED [3]

The parties present two issues on appeal that we restate as:

---

1. Defendant Paul Titzer did not file an appearance on appeal. We note that the parties should have moved to amend the caption. *See* Ind.App. Rule 2(B).

2. We heard oral argument in this case on January 21, 1998.

3. At oral argument, we questioned the parties about the mootness of the issues presented. Although the trial court's order purports to extend the operation of the preliminary injunction "until the trial on the merits of this action," we note that the order can no longer apply to the non-competition agreement executed between Titzer and KM. That agreement expired two years after Titzer terminated his employment with KM, which occurred on August 4, 1995. However, the alleged trade secrets violation, which is the

1. Whether the trial court erred when it determined that KM's customer and pricing information are a trade secret under the Indiana Uniform Trade Secrets Act.[4]

2. Whether the preliminary injunction issued by the trial court is overbroad as it applies to HER.

## FACTS

On July 1, 1994, C. Russell Welder, the owner of KM, purchased a lubrication business from Mine Tech, which was owned by Whitmore Manufacturing Company. Paul Titzer was one of three Mine Tech employees that KM had hired when it purchased the business. Titzer signed a Noncompetition Agreement on August 26, 1994, in which he agreed that both during and for a period of two years subsequent to his employment with KM: (1) he would not sell industrial pumps and lubrications for anyone other than KM in any county in which he had made sales or service calls on KM's behalf, and (2) he would not, either directly or indirectly, solicit any of KM's customers or accounts. The noncompetition agreement provided that an injunction would be the remedy in the case of breach.

Although KM acquired all of Mine Tech's customer information and records, KM's customer and pricing information is comprised of additional information, all of which is updated daily. KM considers its customer and pricing information to be confidential. Specifically, pricing information, the names of personal contacts at each customer location, and overhead information is unavailable from trade publications. In addition, although both its labor rate and overhead are included as part of KM's total bid to a customer, KM considers its labor rate and overhead information to be confidential.

While Titzer was employed with KM, he served as a sales representative in counties in southern and central Indiana, southern Illinois, and western and central Kentucky. In his capacity as a sales representative, Titzer was assigned both existing and potential clients of KM. Specifically, Titzer had contact with the following KM clients: Vulcan Materials, which was formerly known as Reed Crushed Stone, Four Star Fabricators, Black Beauty Coal Company and Solar Sources. Overall, Titzer had approximately seventy to eighty clients to which he sold lubricants, water pumps and lubricant related items.[5] In addition, KM supplied Titzer with customer lists that included: (1) the names of customers and prospective customers, (2) the names of individuals to contact at each customer location, and (3) past histories of each customer showing previous sales history. On August 4, 1995, Titzer orally resigned from his employment with KM.

In September of 1995, Titzer was hired by HER, whose business primarily consists of repairing hydraulic components. Approximately ten percent of HER's business involves lubrication work. HER has done lubrication work for Vulcan Materials, Black Beauty Coal Company, Solar Sources, Peabody Coal Company, Four Star Fabricators and Arch Minerals. Devon Allen, HER's owner, prepares and finalizes all bids for the business. Titzer is a sales representative for HER who calls on customers weekly. According to Allen, Titzer does not sell lubrication systems for HER.

On July 20, 1996, Jack Ellis, the vice president of KM, encountered Titzer during a routine customer call at Kindill Mining. Ellis discussed the noncompetition agreement that Titzer had signed with KM. Specifically, Ellis informed Titzer that the agreement extended for a period of two years, but Titzer replied that he would not turn down any work that came to him. In addition, Titzer had repeatedly contacted Tim Walthall, owner of Four Star Fabricators and customer of

---

only issue presented on interlocutory appeal, has no such limitation. Thus, the issues presented regarding the IUTSA are not moot.

4. See IND.CODE §§ 24–2–3–1 to 24–2–3–8.

5. KM designs and builds various types of automatic lubrication systems. An automatic lubrication system can be installed in any piece of equipment that has moving parts. The purpose of the system is to eliminate the need for manual lubrication of these moving parts. The system operates on a timer so that, once installed, KM's customers need only to fill the reservoir with lubricant. Automatic lubrication systems can be operated by either an air or hydraulic pump.

both KM and HER, approximately two to three months after Titzer had changed jobs. Titzer had contacted Four Star regarding a bid on a lubrication project.

Subsequently, KM filed its complaint and motion for a preliminary injunction against HER and Titzer. Following a hearing on KM's motion, the trial court entered a temporary restraining order and preliminary injunction that precluded HER and Titzer from: (1) offering for sale any industrial pumps or lubricant systems to any customer or client of KM, (2) inducing or attempting to induce any person to terminate an agreement with KM, (3) inducing or attempting to induce any employee of KM to work for or with Titzer or HER, and (4) using or disclosing any trade secret or other proprietary information or pricing information of KM.

## DISCUSSION AND DECISION

### Standard of Review

The issuance of a preliminary injunction is within the sound discretion of the trial court, and the scope of appellate review is limited to deciding whether there has been a clear abuse of discretion. *Reilly v. Daly,* 666 N.E.2d 439, 443 (Ind.Ct.App.1996), *trans. denied.* When determining whether or not to grant a preliminary injunction, the trial court is required to make special findings of fact and state its conclusions thereon. Ind. Trial Rule 52(A). When findings and conclusions are made, the reviewing court must determine if the trial court's findings support the judgment. *Norlund v. Faust,* 675 N.E.2d 1142, 1149 (Ind.Ct.App.1997), *trans. denied.* The trial court's judgment will be reversed only when clearly erroneous. *Id.* Findings of fact are clearly erroneous when the record lacks evidence or reasonable inferences from the evidence to support them. *Id.* We consider the evidence only in the light most favorable to the judgment and construe findings together liberally in favor of the judgment. *Id.*

The trial court's discretion to grant or deny preliminary injunctive relief is measured by several factors: (1) whether the plaintiff's remedies at law are inadequate thus causing irreparable harm pending the resolution of the substantive action if the injunction does not issue, (2) whether the plaintiff has demonstrated at least a reasonable likelihood of success at trial by establishing a prima facie case, (3) whether the threatened injury to the plaintiff outweighs the threatened harm the grant of the injunction may inflict on the defendant, and (4) whether, by the grant of the preliminary injunction, the public interest would be disserved. *Reilly,* 666 N.E.2d at 443. In order to grant a preliminary injunction, the moving party has the burden of showing, by a preponderance of the evidence, that the facts and circumstances entitle him to injunctive relief. *Id.* The power to issue a preliminary injunction should be used sparingly, and such relief should not be granted except in rare instances in which the law and facts are clearly within the moving party's favor. *Id.*

### Issue One: Trade Secrets

HER maintains that the trial court improperly concluded that KM's customer and pricing information were trade secrets under the Indiana Uniform Trade Secrets Act ("IUTSA"). Specifically, HER asserts that KM's customer and pricing information is readily ascertainable by proper means. We disagree.

Under the Indiana Uniform Trade Secrets Act ("IUTSA"), either actual or threatened misappropriation of trade secrets may be enjoined. Ind.Code § 24–2–3–3. The IUTSA defines "trade secret" as:

[I]nformation, including a formula, pattern, compilation, program, device, method, technique, or process, that:

(1) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

(2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Ind.Code § 24–2–3–2. Thus, a protectable trade secret has four characteristics: (1) information, (2) which derives independent economic value, (3) is not generally known, or

readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and (4) the subject of efforts reasonable under the circumstances to maintain its secrecy. *Ackerman v. Kimball Intern,. Inc.*, 634 N.E.2d 778, 783 (Ind. Ct.App.1994) *vacated in part, adopted in part*, 652 N.E.2d 507 (Ind.1995).

In *Amoco Production Co. v. Laird*, 622 N.E.2d 912, 916 (Ind.1993), our supreme court acknowledged the difficulty of defining "trade secrets" under the IUTSA. After determining that the phrase "not being readily ascertainable" is ambiguous, the court held that "where the duplication or acquisition of alleged trade secret information requires a substantial investment of time, expense, or effort, such information may be found 'not being readily ascertainable' so as to qualify for protection under the Indiana Uniform Trade Secrets Act." *Id.* at 919. The court further held that " 'the effort of compiling useful information is, of itself, entitled to protection even if the information is otherwise generally known.' " *Id.* at 919 (quoting *ISC–Bunker Ramo Corp. v. Altech, Inc.*, 765 F.Supp. 1310, 1322 (N.D.Ill.1990)).

Here, C. Russell Welder, KM's owner, testified that KM compiles customer lists and pricing information that are updated on a daily basis. The pricing information includes profits per customer, sales per customer, special suppliers, overhead and specific pricing information that is used for its product lines. Welder testified further that the customer and pricing information is entered into the computer system daily so that the information is available to sales representatives or to the administration at any time. Although both overhead information and labor rates are revealed to customers as part of the total bid on a particular project, Welder explained that all of KM's customer and pricing information is considered confidential and that KM's employees are informed accordingly. In order to ensure confidentiality, the customer and pricing information compiled each day is backed-up on the computer system and placed into a safe located in Welder's office.

Still, HER maintains that KM's customer information was readily ascertainable by proper means. Specifically, HER argues that, given the discrete market of industrial pumps and lubricant systems, HER could easily ascertain companies in need of these services through the telephone book. Further, HER maintains that Devin Allen, the owner of HER, had been in the business for more than ten years and knew what customers to contact.

We agree that KM's customer list, in itself, is not a protected trade secret under the IUTSA. It is undisputed that HER and KM provide specialized services to a group of readily identifiable customers or clients in the mining industry and, further, that persons within this discrete market area are known to one another. However, KM's compilations include more than the names of its customers. The customer and pricing information that KM claims as a trade secret includes profits, sales and special suppliers that are specific to each customer. Thus, under *Amoco*, KM's effort of compiling its customer and pricing information is entitled to protection even if the customer names may generally be known. *Amoco*, 622 N.E.2d at 920. In addition, the nature of KM's business, which relies heavily on goodwill among its clients and potential customers, requires KM to compile this type of account history information to better serve customers and, thus, KM derives economic value from it. Given this evidence, we conclude that the trial court did not abuse its discretion when it determined that KM's customer and pricing information together qualify as a protected trade secret under the IUTSA.

### Issue Two: Overbreadth of the Preliminary Injunction

HER argues that the trial court's preliminary injunction is overbroad as it applies to HER. Specifically, HER maintains that the evidence fails to support any reasonable inference that HER knowingly misappropriated KM's trade secrets through its employment of Titzer. HER challenges the following trial court findings and conclusions:

13. On or after September 1, 1995, HER, through Titzer, attempted to solicit KM's current and potential customers in southern Indiana, Western Kentucky, and

southern Illinois, for the sale of HER products and has, by its employment of Titzer, come into the possession of KM trade secrets, which trade secrets HER could not have duplicated or acquired without a substantial investment of time, expense and effort.

\*     \*     \*     \*     \*     \*

8. It is appropriate to enter a temporary restraining order and preliminary injunction restraining HER, Titzer, and HER's officers, agents, servants, employees, attorneys, and those in active concert or participation with them, from using any information it obtained from or through Titzer and from contacting any customers of KM, or in any way utilizing the pricing information developed by KM in the area as described.

As stated above, the IUTSA provides that either actual or threatened misappropriation of trade secrets may be enjoined. IND.CODE § 24–2–3–3. The IUTSA defines "misappropriation" of a trade secret as:

(1) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(2) *disclosure or use of a trade secret of another without express or implied consent by a person who:*

(A) used improper means to acquire knowledge of the trade secret;

(B) *at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:*

(i) derived from or through a person who had utilized improper means to acquire it;

(ii) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

(iii) *derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use;* or

(C) before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

IND.CODE § 24–2–3–2 (emphasis added). Thus, in order for KM to show that HER had misappropriated its trade secrets, KM must demonstrate that: (1) HER disclosed or used KM's trade secrets without KM's consent, and (2) at the time of HER's disclosure or use, HER knew or had reason to know that it had acquired the information from Titzer, who owed a duty to KM through the noncompete agreement to maintain the secrecy of the information.

■ According to Indiana Code § 24–2–3–3, when a threat exists that trade secrets may be misappropriated in the future, the trial court is authorized to issue an injunction. This comports with the purpose of a preliminary injunction, which is to prevent harm to the moving party which could not be corrected by a final judgment. *Indiana State Bd. of Public Welfare v. Tioga Pines Living Center, Inc.*, 575 N.E.2d 303, 306 (Ind.Ct.App.1991), *trans. denied.* A final judgment would be rendered meaningless if irreparable injury were to occur during the course of litigation. *Id.* Here, KM presented no direct evidence that HER had received any of KM's customer and pricing information from Titzer, nor was evidence presented that HER knew of Titzer's noncompetition agreement with KM. However, KM did present evidence that HER utilized Titzer in preparing bids for customers that Titzer had as clients when he worked at KM.

KM would suffer irreparable harm if HER were to continue to allow Titzer to prepare bids for customers about whom he had gained specific knowledge while employed at KM. Essentially, Titzer could use the knowledge he gained at KM to prepare more competitive bids for HER. We conclude that to the extent that HER utilized Titzer in preparing these bids, the trial court could reasonably infer a threat that HER would benefit from Titzer's knowledge of KM's confidential customer and pricing information. Thus, the trial court did not abuse its discretion when it enjoined HER from using or disclosing KM's trade secrets when it prepares bids for customers.

■ The court's preliminary injunction provides:

IT IS THEREFORE ORDERED, that HER, Titzer, HER's officers, agents, ser-

vants, employees, attorneys, and those in active concert or participation with them, are preliminary enjoined, pursuant to Trial Rule 65(A) of the Indiana Rules of Procedure until the trial on the merits of this action from:

1. Offering for sale any industrial pumps or lubricant systems, including automated lubricant systems and turnkey lubetruck installations, *to any customer or client of KM;*

2. Inducing or attempting to induce any person to terminate any agreement with KM;

3. Inducing or attempting to induce any employee of KM to work for, or with, or become an employee, partner, representative, shareholder, agent, or servant of Titzer and/or HER;

4. *Using or disclosing any trade secret or other proprietary information or pricing information of KM.*

(emphasis added). As written, the court's preliminary injunction fails to link any future solicitation of KM customers by HER with the use or disclosure of KM's trade secrets. According to paragraph one of the order, HER is enjoined from selling industrial pumps or lubricant systems to any customer or client of KM. This categorical prohibition against offering certain product lines for sale to "any customer or client of KM" is overbroad in that, as we have already determined in this case, it is KM's trade secrets and not its customers or clients that are protected from appropriation under the IUTSA. The injunction as it applies to HER should be limited to those solicitations made by HER in which HER might utilize KM's trade secrets including, specifically, transactions in which Titzer participates, directly or indirectly. Thus, we remand to the trial court with instructions to modify the preliminary injunction as it relates to HER.

Affirmed in part and reversed in part and remanded.

BAKER and RILEY, JJ., concur.