The **STANDARD REGISTER COMPANY**, Plaintiff,

v.

Phil **CLEAVER**, Defendant.

No. 1:98–CV–231.

United States District Court, N.D. Indiana, Fort Wayne Division.

Oct. 14, 1998.

Lawrence R. Elleman, James V. Schuster, Dinsmore and Shohl, Cincinnati, OH, Leonard E. Eilbacher, Eilbacher Scott Inc., Fort Wayne, IN, for Plaintiff.

Robert L. Thompson, Thompson and Rogers, Fort Wayne, IN, for Defendant.

## MEMORANDUM OF DECISION AND ORDER

COSBEY, United States Magistrate Judge.

### I. INTRODUCTION

This matter is before the Court [1] on the issues raised by the motion for preliminary injunction filed by the Plaintiff, The Standard Register Company (hereafter "Standard Register").

Pursuant to the order of this Court, counsel have submitted briefs and proposed find-

1. Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting.

ings of fact and conclusions of law in support of their respective positions. An evidentiary hearing was held on Standard Register's motion for a preliminary injunction on September 21, 1998. This Court has jurisdiction pursuant to 28 U.S.C. § 1332.

For the following reasons, Standard Register's motion for a preliminary injunction will be GRANTED in part and DENIED in part.

## II. FINDINGS OF FACT[2]

In the summer of 1981 the Defendant, Phil Cleaver ("Cleaver"), an Indiana resident, interviewed for a job with UARCO, Incorporated ("Uarco") in both Fort Wayne and Indianapolis, Indiana. Uarco was a Delaware corporation, having its headquarters and principal place of business in Barrington, Illinois. Eventually, Cleaver was offered a position with Uarco by District Manager Max Bodkin ("Bodkin"), while interviewing at Uarco's Toledo, Ohio, district office. Cleaver accepted employment with Uarco on the spot, and signed a Salesman's Agreement ("the Salesman's Agreement") on August 24, 1981. (*See* Plaintiff's Exh. 9.) Cleaver thus became an employee at will for Uarco, selling such things as printed business forms, pressure sensitive labels, stock computer forms, bar code labels, and other Uarco business specialty printing items.

More importantly for our discussion here, however, is the following language contained in the Salesman's Agreement:

8. Salesman agrees that while in the employ of Company or at any time thereafter he will not, without the express written consent of the Company, directly or indirectly communicate or divulge to or use for the benefit of himself or any other person, firm, association or corporation, any of Company's trade secrets or other confidential information, which trade secrets and confidential information were communicated to or otherwise learned of or acquired by Salesman in the course of employment with Company. . . .

\* \* \* \* \* \*

9. For a period of two years following the termination of his employment for any reason whatsoever (or if this period. shall be unenforceable by law, then for such period as shall be enforceable), Salesman agrees that he will not contact, with a view towards selling any product competitive with any product sold or proposed to be sold by Company at the time of the termination of Salesman's employment, or sell any product to, any person, firm, association or corporation:

(a) to which Salesman sold any product of Company during the year preceding the termination of Salesman's employment,

(b) which Salesman solicited, contacted, or otherwise dealt with on behalf of Company during the year preceding termination of Salesman's employment.

(c) which is known by Salesman to have been a customer of Company during the year preceding termination of Salesman's employment and which is located either within the geographical territory served by any District Office of Company to which Salesman was assigned during such year or within the same metropolitan area as any customer named in the Confidential Customer List in effect hereunder as of the date of termination of Salesman's employment.

Salesman agrees that he will not directly or indirectly make any such contract or sale either for the benefit of himself or for the benefit of any other person, firm, association or corporation, and further that he will not in any manner assist any person, firm, association or corporation to make any such contract or sale.[3]

---

**2.** So as to comply with Fed.R.Civ.P. 52(a) the Court makes the following Findings of Fact, which will be set out in narrative fashion. Any finding of fact deemed to be a conclusion of law is hereby incorporated as such and any conclusion of law deemed to be a finding of fact is hereby incorporated as such.

**3.** Standard Register currently only seeks to enforce paragraphs 8, (i.e., the non-disclosure provision) 9(a) and 9(b) (i.e., the non-solicitation provisions) of the Salesman's Agreement under the present motion for preliminary injunction.

The Salesman's Agreement also acknowledges that any breach of either paragraphs 8 or 9 would cause irreparable harm to the employer and that actual damages would be difficult if not impossible to ascertain. (*Id.* ¶ 10(b).)

Immediately following his employment, Cleaver was assigned a sales territory in the Lima, Ohio, area where he lived and worked until he was ultimately transferred to Fort Wayne, Indiana, in the spring of 1982. Cleaver's new sales territory thus became the counties of northeast Indiana. At first, Cleaver continued to report to Bodkin, his Toledo supervisor, but in 1989 he was redistricted by Uarco to District Manager Leigh Anderson ("Anderson"), in Indianapolis. Following his transfer, Cleaver solicited customers and sold Uarco products almost exclusively within northeast Indiana. Moreover, until his Uarco employment ended on April 15, 1998, almost all of Cleaver's communications with Uarco were with Anderson in Indianapolis or with corporate headquarters in Barrington, Illinois.[4]

Eventually, in the fall of 1997, Cleaver heard rumors that Standard Register would be acquiring Uarco. Uarco and Standard Register, an Ohio corporation with its principal place of business in Dayton, Ohio, were at the time two of the leading business form printing companies.[5] Indeed, on January 1, 1998, Standard Register acquired all of the shares of Uarco, and on March 31, 1998, Uarco merged with Standard Register pursuant to Ohio Rev.Code § 1701.82(A)(3). (*See* Plnf. Exhs. 23–24.) Cleaver remained employed by Uarco until its merger on March 31, 1998, and was then with Standard Register until he resigned his employment on April 14, 1998, effective the next day. (*See* Plnf. Exh. 10.)

Cleaver commenced new employment with Prograde, Inc. ("Prograde") on April 16, 1998, as a salesman selling the same type of printed business materials he sold for Uarco and Standard Register. (Plnf.Exh. 8.) As he was leaving Standard Register, however, Cleaver misrepresented to Anderson the name of his new employer, knowing that any mention of Prograde would spark enforcement of the Salesman's Agreement.[6] (Plnf. Exhs. 18, 19; Def. Exh. Q.)

Upon his leaving the Uarco/Standard Register office on April 14, 1998, Cleaver took some documents which memorialized the names of some of his customers and some prior sales. However, this information does not disclose any pricing proprietary to Uarco or Standard Register. Indeed, throughout the merger, Uarco's computer system of pricing, the Bann system, had been largely phased out in favor of Standard Register's STAR and PRISM systems, with which Cleaver was not familiar.

In his employment with both Uarco and Standard Register, Clever developed a personal acquaintanceship with his customers which was his employer's primary, and in many cases, sole contact with its customers. Cleaver gained a position of trust and confidence with respect to his employer's affairs and its products, and his relationships with customers were highly service oriented. Indeed, regardless of re-ordering cycles, he visited his major customers at least every two weeks, and sometimes more often.[7] (Plaintiff's Exh. 17.) Uarco and Standard Register depended on Cleaver developing personal relationships with their customers and they were highly vulnerable in the event Cleaver would leave and solicit such customers on behalf of a competitor. Indeed, in this business, customer relationships frequently took years to develop, and in fact, it had taken Cleaver many years to develop his major accounts to their current level by the time of his resignation in April 1998. For example, in the first year of his business

---

4. On a few rare occasions Cleaver would have direct discussions with some Uarco printing facilities, none of which were in Indiana or Ohio.

5. With Uarco and Standard Register merging, the number of "major" business form printing companies has been essentially reduced to four.

6. Part of Cleaver's employment agreement with Prograde provides that they are to pay his expenses for this litigation. Clearly Cleaver anticipated vigorous enforcement of his Salesman's Agreement by Standard Register and hoped to delay it for as long as possible.

7. Cleaver was particularly attentive to HWI, a/k/a Do it Best Corp. (hereafter "HWI"), visiting that customer at least 20 times throughout January, February and March 1998.

relationship with HWI, and even through HWI was an existing Uarco customer, he did only about $350,000 in business, after about four (4) years his business with them grew to $750,000, but by the time of his departure, he was doing over $1,000,000 per year with HWI. In the first four months of his employment at Prograde, he sold over $1,000,000 to HWI.[8]

Cleaver also solicited his other customers on behalf of Prograde. Between April 15, 1998, and August 1998, he sold Prograde competitive products to the following Standard Register customers, to which he had sold similar products, on behalf of Uarco or Standard Register within the last year of his employment with them:

| | |
|---|---|
| HWI, a/k/a Do it Best Corp. | $1,031,600.00 |
| Centennial Communications | $55,825.00 |
| Wells Community | $4,552.00 |
| Super Valu | $9,660.00 |
| Dana Corp. | $4,480.00 |
| Gasoline Equipment | $1,408.00 |
| Fasson | $746.00 |
| DeKalb Memorial | $841.00 [9] |
| Fort Wayne Newspapers | $79.00 |
| **TOTAL** | **$1,109,191.00** |

(*See* Plnf. Exh. 4.)

Standard Register contends that as a result of Cleaver's affiliation with Prograde it will suffer irreparable harm unless he is enjoined from soliciting those customers to whom he sold Uarco or Standard Register products during the year preceding April 15, 1998, in accordance with paragraph 9(a) of the Salesman's Agreement. Indeed, Standard Register also wants to enjoin Cleaver from selling to anyone he even solicited or contacted within the year preceding April 15, 1998. (*See* Salesman's Agreement ¶ 9(b).)

On the other hand, Cleaver contends that none of the provisions of the Salesman's Agreement are enforceable, and that they are certainly not enforceable by Standard Register in particular.

More facts may be provided later, *see* footnote 1, *supra*, but the Court will first discuss the applicable legal standard.

## III. LEGAL ANALYSIS

### A. Standard for a Preliminary Injunction

As the Seventh Circuit recently stated in *Graham v. Medical Mut. of Ohio*, 130 F.3d 293 (7th Cir.1997), the moving party must show the following to obtain a preliminary injunction:

1) 'a reasonable likelihood of success on the merits, and 2) no adequate remedy at law and irreparable harm if preliminary relief is denied.' *Mil–Mar Shoe Co., Inc. v. Shonac Corp.*, 75 F.3d 1153, 1156 (7th Cir.1996); *see also TMT North America, Inc. v. Magic Touch GmbH*, 124 F.3d 876, 877 (7th Cir.1997); *Grossbaum v. Indianapolis–Marion County Bldg. Auth.*, 100 F.3d 1287, 1291 (7th Cir.1996), *cert. denied*, — U.S. ——, 117 S.Ct. 1822, 137 L.Ed.2d 1030 (1997); *Roth v. Lutheran Gen. Hosp.*, 57 F.3d 1446, 1453 (7th Cir. 1995); *Abbott Lab. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir.1992). If the movants satisfy this initial burden, the court must balance the irreparable harm to the non-moving party if the injunction is granted against the irreparable harm to the moving party if the injunction is denied. *See Grossbaum*, 100 F.3d at 1291; *Publications Int'l, Ltd. v. Meredith Corp.*, 88 F.3d 473, 478 (7th Cir.1996); *Abbott Lab.*, 971 F.2d at 11. The court must also consider the effect of the injunction on nonparties. *See TMT North America*, 124 F.3d 876, 877; *Grossbaum*, 100 F.3d at 1291–92; *Erickson v. Trinity Theatre, Inc.*, 13 F.3d 1061, 1067 (7th Cir.1994).

### B. Conclusions of Law and Discussion[10]

This Court has jurisdiction based on diversity of citizenship. 28 U.S.C. § 1332(a)(1). In such a setting, the choice of law rules of the forum state, here Indiana, determines the substantive law that applies.

---

**8.** Most of this unusually large amount of sales stems from "test orders" Cleaver took on behalf of Standard Register, but which he ultimately filled with Prograde. This also explains many of Cleaver's visits to HWI in the first quarter of 1998. *See* note 7, *supra*.

**9.** While Clever contends that he did not have contact with DeKalb Memorial within the last year of his employment, his sales records reflect otherwise. (*See* Plnf. Exh. 1.)

**10.** Footnote 1 *supra*, is incorporated herein by reference.

*Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

"Indiana's choice of law rule for actions on contract calls for applying the law of the forum with the most intimate contacts to the facts." *Hartford Accident and Indem. Co. v. Dana Corp.*, 690 N.E.2d 285, 291 (Ind. App.1997) (citing *Dohm and Nelke v. Wilson Foods Corp.*, 531 N.E.2d 512, 513 (Ind.App. 1988)). The court is to consider all acts of the parties touching the transaction in relation to the several states involved, and is to apply ·the law of that state with which the facts are in most intimate contact. *Id.* (citing *W.H. Barber Co. v. Hughes*, 223 Ind. 570, 63 N.E.2d 417, 423 (1945)). In making this determination, Indiana follows the RESTATE-MENT (SECOND) OF CONFLICT OF LAWS and thus considers:

(a) the place of contracting,

(b) the place of negotiation of the contract,

(c) the place of performance,

(d) the location of the subject matter of the contract,

(e) the domicile, residence, nationality, place of incorporation, place of business of the parties.

*Id.* (citing Restatement (Second) Conflict of Laws, § 188 (1971)).

The Restatement (Second) Conflict of Laws § 291 has implications here as well, given the agency relationship between Uarco and Cleaver:

The rights and duties of a principal and agent towards each other are determined by the local law of the state which, with respect to the particular issue, has the most significant relationship to the parties and the transaction under the principles stated in § 6. This law is selected by application of the rules of sections 187–188.

Thus, in determining which state has the "most intimate contacts" to the facts, or whether Indiana or Ohio has the "most significant relationship" to the parties and the transaction, the Court should consider the representative factors set forth in Restatement (Second) Conflict of Laws § 188. *Dohm and Nelke*, 531 N.E.2d at 513. How-

ever, those factors have varying degrees of importance depending on the facts of the case. *See* Restatement (Second) Conflict of Laws, § 188, Comment e.

In addressing the salient factors, it is apparent that the place of contracting was Ohio, although the record is unclear as to the actual place of negotiation. The place of initial performance was also Ohio, since that is where Cleaver was first assigned, although it was apparently contemplated that he would soon move to Indiana (the place of his residence), and indeed he moved there shortly after commencing employment with Uarco. Obviously the state where the majority of the performance occurred was Indiana, and it clearly has a significant interest in the question of whether the non-solicitation agreement is enforceable. Indeed, at the time of his termination Cleaver had been selling Uarco Products for seventeen years almost exclusively within the state of Indiana, and he had been formally assigned by Uarco to the Indianapolis sales office since 1989. Thus, by 1989 both Uarco and Cleaver recognized that the situs of his employment contract was principally, if not exclusively, Indiana. This is significant because of all the contacts between the parties, the contact "which will usually be of greatest importance is the place, ... where under the provisions of the agreement the agent is to act, or principally to act, in the principals behalf." *See* Restatement (Second) Conflict of Laws, § 291, Comment f. In short, the subject matter of the contract was essentially located in Indiana and substantial performance by both parties was to occur here. *Dohm and Nelke*, 531 N.E.2d. at 514. Moreover, the facts giving rise to all three (3) of Standard Register's claims occurred in the state of Indiana.[11] *Id.*

Finally, Cleaver's place of domicile and residence is the state of Indiana. Uarco, which apparently no longer exists, was an Illinois corporation. Standard Register is an Ohio corporation with its principal place of business in Ohio, but it has conducted business in the state of Indiana for a long time

---

**11.** Standard Register alleges in its complaint three (3) separate counts against Cleaver: Count I (Breach of Contract); Count II (Misappropria-tion of Trade Secrets); Count II (Breach of Fiduciary Duty).

through its sales personnel. Thus, the Court concludes that Indiana has the most significant relationship to the parties, as well as being the site of the alleged breach of the Salesman's Agreement, and that it also has the most intimate contacts with the facts. Therefore, Indiana law should govern this case.

■ This is not to suggest, however, that *ipso jure*, Standard Register cannot enforce the non-solicitation and non-disclosure provisions of the agreement between Cleaver and Uarco. As previously noted, Uarco merged with Standard Register at least by March of 1998. Accordingly, Standard Register automatically, and by operation of Ohio law (the law that governed the merger), became vested with:

> all assets and property of every description and every interest in the assets and property, wherever located, and the rights, privileges, immunities, powers, franchises and authority of a public, as well as a private nature, of [Uarco] and all obligations belonging to or due to [Uarco] ... without further act or deed.

*See* Ohio Rev.Code § 1701.82(A)(3). Thus, Standard Register now possesses the right to enforce Cleaver's Salesman's Agreement with Uarco. (Plnf.Exhs.23–24.) *See also Uarco, Inc. v. Dupea*, Case No. C98–259R, slip op. at II(d) (W.D.Wash. July 24, 1998); *Uarco, Inc. v. Lamm*, Case No. 98–00177, slip op. at 1, 13 (D. of Haw.1998).

Undaunted, Cleaver argues that the Salesman's Agreement was a personal service contract with Uarco and that they could not assign it to Standard Register without his consent. This ignores, of course, the fact that the acquisition of Uarco was by merger, not an assignment, and that under Ohio law, which governs as to the Uarco–Standard Register agreement, Standard Register automatically succeeded to the rights and obligations of its predecessor. *Id.* Indiana law is not inapposite. *See* Ind.Code § 23–1–40–6.

Nevertheless, Cleaver argues that under Indiana law Standard Register cannot enforce the Uarco agreement. Although Cleaver seeks support in the case of *Norlund v. Faust,* 675 N.E.2d 1142 (Ind.App.1997), a close reading of that case reveals that it did not involve a merger, but rather the attempted assignment of a personal service contract from a sole proprietorship to a newly formed closely-held corporation. *Id.* at 1147, 1151–52. *See also SDL Enterprises, Inc. v. DeReamer,* 683 N.E.2d 1347, 1348 (Ind.App.1997) (dealing with the assignment of a covenant not to compete). Thus, while Indiana law may not permit such assignments, *id.*, that does not dispose of Standard Register's claim.

■ Rather, Indiana law recognizes that with a valid merger, such as we have here, the surviving corporation succeeds to the covenant rights of the merged corporation. *Peters v. Davidson, Inc.*, 172 Ind.App. 39, 359 N.E.2d 556, 562 (Ind.App.1977). *See also* Annotation *Enforceability, by Purchaser or Successor of Business of Covenant Not to Compete Entered into by Predecessor and its Employees,* 12 A.L.R.5th 847 §§ 3[a], 16 (1993). Consequently, *Norlund* does not apply so as to defeat Standard Register's enforcement of the Salesman's Agreement. However, all of this simply sets the stage for the principal question: are the non-solicitation and non-disclosure provisions in the Salesman's Agreement valid and enforceable under Indiana law?

■ It is well-settled that Indiana disfavors covenants not to compete as restraints on trade. *The Harvest Ins. Agency, Inc. v. Inter–Ocean Ins. Co.*, 492 N.E.2d 686, 688 (Ind.1986) (citing *Licocci v. Cardinal Assocs., Inc.*, 445 N.E.2d 556 (Ind.1983)). Such covenants are to be strictly construed against the covenantee and enforced only if reasonable. *Id.* at 688 (citing *Donahue v. Permacel Tape Corp.*, 234 Ind. 398, 127 N.E.2d 235 (1955)); *see also JAK Productions, Inc. v. Wiza,* 986 F.2d 1080, 1085 (7th Cir.1993). However, if the restriction is reasonable as to the parties and the general public, the covenant is enforceable and not void as against public policy. *Norlund,* 675 N.E.2d at 1153. The issue of reasonableness is a question of law which rests upon facts gleaned from the totality of the circumstances. *Harvest Ins. Co.*, 492 N.E.2d at 688 (citing *Raymundo v. Hammond Clinic Assoc.*, 449 N.E.2d 276 (Ind. 1983)). Nonetheless, the covenant here must be strictly construed against Standard Register and enforced only if reasonable. *Id.*

Whether a covenant contains reasonable restrictions depends upon the legitimate business interests of the employer which might be protected by the covenant, in conjunction with the duration, the geographic area, and the types of activity proscribed. *Harvest Ins.,* 492 N.E.2d at 688 (citing *4408, Inc. v. Losure,* 175 Ind.App. 658, 373 N.E.2d 899, 900 (Ind.App.1978)).

Standard Register contends that the business interests at stake here are its goodwill, trade secrets and confidential information, and that it first seeks to prevent Cleaver from directly or indirectly communicating or divulging trade secrets or confidential information to others, including Prograde. (*See* Salesman's Agreement ¶ 8.) However, when it comes to specifics as to what it considers "trade secrets," or "confidential information," Standard Register retreats to generalities, apparently cataloging the information as: "customers and prospective customers, customer needs for specific products, methods of obtaining and retaining customers, cost and pricing information, special methods and processes involved in designing, assembling and selling plaintiff's product...." (Plaintiff's Amended Proposed Findings of Fact and Conclusions of Law ¶ 15 at 7.)

Of course, under the Indiana Uniform Trade Secrets Act ("IUTSA"), either actual or threatened misappropriation of trade secrets may be enjoined. Ind.Code § 24-2-3-3. However, the IUTSA defines a "trade secret" as:

> [I]nformation, including a formula, pattern, compilation, program, device, method, technique, or process that: (1) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Ind.Code § 24-2-3-2. Thus, under Indiana law a protectable trade secret has four characteristics: (1) information, (2) which derives independent economic value, (3) is not generally known, or readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and (4) the subject of efforts reasonable under the circumstances to maintain its secrecy. *Hydraulic Exchange and Repair, Inc. v. KM Specialty Pumps, Inc.,* 690 N.E.2d 782, 786 (Ind.App.1998) (citing *Ackerman v. Kimball Int'l, Inc.,* 634 N.E.2d 778, 783 (Ind.App. 1994) *vacated in part, adopted in part,* 652 N.E.2d 507 (Ind.1995)).

On this record, however, Standard Register points to little that would actually classify as a true trade secret. The information as to the identity of Standard Register's customers or potential customers is something that is already readily known in the industry. *Hydraulic Exchange,* 690 N.E.2d at 786. The methods of obtaining and retaining customers is also something that is either generally known, or readily ascertainable without a substantial investment of time, expense or effort, and Standard Register has not indicated that it has taken any efforts to protect this allegedly secret information. *Id.* (citing *Amoco Prod. Co. v. Laird,* 622 N.E.2d 912, 916 (Ind.1993)). The contention that customer needs and the processes for the design, assembly and selling of business forms constitutes trade secrets also seems problematic. Indeed, the evidence reveals that customers are quite willing to "shop around," and that they will reveal their needs and competing quotes to competitive salesmen. Thus, in general, this information appears to be readily ascertainable without much investment of time, expense or effort, and in any event, Standard Register has not demonstrated that it has taken any reasonable efforts to maintain its secrecy. *Id.* Finally, it has not been shown that the processes for the design, assembly and selling of business forms is a trade secret; indeed, the testimony reveals that once a form has been designed, practically any "jobber" can duplicate an existing form for a customer, and within limits can presumably redesign one, too. Therefore, these matters do not appear to qualify as trade secrets.

To the extent that Standard Register is contending that its production and marketing costs, sales and pricing information are either trade secrets, or confidential within the meaning of paragraph 8 of the Salesman's Agreement, *see, e.g., Ackerman,* 652 N.E.2d at 510–11, it has not been shown that

at the time Cleaver left Standard Register that he possessed this information. While Cleaver took some documents that might have revealed some of Uarco's pricing information, Standard Register had already restructured the Uarco prices with which Cleaver was familiar under the old Bann system, such that what he took was already likely dated and of little value. Moreover, even on similar jobs, Standard Register may have different gross mark ups, thus making it extremely unlikely that a salesman can with assurance determine "the price to beat." Consequently, if Cleaver ever possessed any such knowledge, it now has "limited and diminishing potential value," and indeed, it has not been shown that Cleaver has either utilized or disclosed this rather ephemeral information to Standard Register's detriment. *Bridgestone/Firestone, Inc. v. Lockhart,* 5 F.Supp.2d 667, 681 (S.D.Ind. 1998). Thus, Standard Register has failed to show the need for an injunction as to these matters.

■ Nevertheless, Standard Register contends that Cleaver is also trading on its good will, a resource sometimes defined as including the names, addresses and requirements of customers, and the advantage acquired through representative contact with the trade in the area. *American Shippers Supply Co. v. Campbell,* 456 N.E.2d 1040, 1043 (Ind.App.1983) (quoting *Donahue v. Permacel Tape Corp.,* 234 Ind. 398, 127 N.E.2d 235, 240 (Ind.1955)). However, while customer lists may be protectable, they are not confidential if the information is readily available to the public, *American Shippers,* 456 N.E.2d at 1040, or if the allegedly confidential practice could be observed by anyone. *Norlund,* 675 N.E.2d at 1154 (citing *Slisz v. Munzenreider Corp.,* 411 N.E.2d 700 (Ind. App.1980)). Here, the evidence discloses that all of Standard Register's competitors know its customer base, essentially know who is quoting the available work, and that they are generally familiar with what a particular customer requires. Thus, it has not been shown that Standard Register has a protectable interest in secret or confidential information so as to form the basis for en-

forcing paragraph 8 of the Salesman's Agreement.

■ However, "good will" is broader, than simply the names, addresses and requirements of customers, or some pricing information, it also includes the advantageous familiarity and personal contact that employees, such as Cleaver, derive from their dealings with the employer's customers. This, of course, is the thrust of the non-solicitation provision at paragraph 9 of the Salesman's Agreement. In short, the familiarity with customers and their accounts is a protectable interest for the employer, regardless of whether he or she had access to confidential information. *Donahue,* 127 N.E.2d at 240; *Licocci,* 445 N.E.2d at 563; *Field v. Alexander & Alexander of Indiana, Inc.,* 503 N.E.2d 627, 633 (Ind.App.1987) ("in industries where personal contact between the employee and customer are especially important due to similarity in the product offered by competitors, the advantage acquired through the employee's representative contact with customers is part of the employer's good will, irrespective of whether or not the employee had access to confidential information."); *Miller v. Frankfort Bottle Gas, Inc.,* 136 Ind.App. 456, 202 N.E.2d 395, 398 (1964).

Here, though it has not been shown that Cleaver retained truly confidential information upon leaving Standard Register, there has been a showing that there was at least a personal relationship between Cleaver and his customers, particularly HWI. Obviously, Cleaver assiduously courted HWI; indeed, he held out to Prograde the relationship he had developed with HWI (and Centennial Communications as well) as good reasons for hiring him as a salesperson.[12] Moreover, given his long standing relationship with HWI, Cleaver had developed some special skill and knowledge as to the operation of that firm, having promoted Uarco's and Standard Register's "value added" concept of service. In short, Cleaver was not a mere salesperson of business forms to HWI, but a "problem solver," utilizing Uarco's and Standard Register's technical knowledge and

---

12. Cleaver admits that in the last year of his employment, he was the only contact that either Uarco or Standard Register had with HWI.

printing services to actually improve HWI's method of doing business.[13] Cleaver also dealt directly with HWI's operations manager, Chuck Thatcher, the person in charge of HWI's computer operations, and thus was strategically placed so as to monitor all facets of HWI's business needs and to know how information flowed through the HWI system. From this relationship HWI developed a sense of trust in Cleaver, which led to more and more sales. Indeed, it can be inferred that Cleaver treated all of his accounts in such a fashion, which explains how he was able to so easily retain their business for Prograde.

Indeed, this case can be likened to *Field* in that while Cleaver does not possess confidential information, the employer's protectable interest stems from the quality of the representative contact of its employee with its customers. *Field,* 503 N.E.2d at 633; *see also Norlund,* 675 N.E.2d at 1155. Of course, this does not mean that price, for example, is never a "controlling consideration," but as in *Field,* the difference in the price and quality of two competing business form products is often razor thin, such that the "personal contacts of the salesman and the development of a trusting relationship between the customer and the salesman [is] a key factor in [Prograde or Standard Register] securing the business." *Id.; see also Miller,* 202 N.E.2d at 398. Thus, like in *Field,* Standard Register had a good will property interest to protect, which means that now we must examine the covenant at paragraphs 9(a) and 9(b) to determine, in light of the interest to be protected, whether it is overly restrictive. *Id.*

 The covenant sought to be enforced at paragraph 9 can be no broader than is necessary for the protection of the good will interests of the employer. *Field,* 503 N.E.2d at 633 (citing *Donahue,* 127 N.E.2d at 238). Here, Standard Register seeks only to enforce paragraphs 9(a) and 9(b) of the Salesman's Agreement and thus seeks to prohibit Cleaver for a period of two years following his April 1998 termination from contacting, with a view towards selling a competitive product to: 1) any person, firm or corporation to which Cleaver sold any Standard Register or Uarco product during the year proceeding his April 1998 termination (i.e., paragraph 9(a)); or 2), any person, firm or corporation which Cleaver solicited, contacted or otherwise "dealt with" on behalf of Standard Register or Uarco within the year proceeding his termination (i.e., paragraph 9(b)).

 In imposing these restrictions, the covenant does not seek to define a geographic scope; rather it seeks to recognize that if any good will developed between Cleaver and his customers, it could only have come from Cleaver's personal contacts with them. *Field,* 503 N.E.2d at 633. Thus, while the scope of a covenant can be limited through geographical boundaries, it can also be done by increasing the specificity of the class of persons with whom contact is prohibited because "as the specificity of limitation regarding the class of person with whom contact is prohibited increases, the need for limitation expressed in territorial terms decreases." *Id.* at 635 (quoting *Seach v. Richards, Dieterle and Co.,* 439 N.E.2d 208, 213 (Ind.App.1982)). In other words, the covenant "must be sufficiently specific in scope to coincide with only the legitimate interests of the employer and to allow the employee a clear understanding of what conduct is prohibited." *Id.* Thus, the specificity of the general class of persons described in paragraph 9(a) of the covenant is sufficiently precise as to render it enforceable without any further geographic limitations, and it coincides perfectly with what is clearly Standard Register's protectable interest—the buying customers with whom Cleaver has developed a relationship. *See Field,* 503 N.E.2d at 635.

 In contrast to paragraph 9(a), paragraph 9(b) goes further in that it seeks to restrict Cleaver from contacting any person or firm whom he "solicited, contacted, or otherwise dealt with," on behalf of either Uarco or Standard Register during the year preceding his termination. There is no showing, however, that by merely soliciting, contacting, or somehow dealing with someone that business form salesmen in general, or Cleaver in particular, can establish the type

13. Cleaver characterized the "value added" concept as "giving ideas to a customer."

of personal relationship that gives rise to a protectable interest. *See Seach,* 439 N.E.2d at 214 n. 5. Indeed, there is an apparent presumption under Indiana law that a covenant restraining business with "customers" concerns only those who are customers at the time of the employees termination. *JAK Prods.,* 986 F.2d at 1089 (citing *Field,* 503 N.E.2d at 634.) However, the restriction at paragraph 9(b) goes even further than that; truly read, it could easily apply to persons or firms that were never customers of Standard Register at all. Thus, if in Indiana a restriction is over broad because it prohibits contact with "past" clients, *see Seach,* 439 N.E.2d at 213, and if there is a presumption that a covenant restraining business with customers concerns only those who are customers at the time the employee's termination, *Field,* 503 N.E.2d at 634, then certainly any restriction involving past non-customers (or who were at least not customers at the time of Cleaver's termination) can not be an enforceable covenant. *Id.* Nevertheless, while paragraph 9(b) is not enforceable, it can also be easily scratched from the Salesman's Agreement without the need to either rewrite the existing agreement, or to add terms. *Hahn,* 581 N.E.2d at 462. Thus, in order to make the covenant otherwise enforceable, paragraph 9(b) should be "blue penciled" from the Salesman's Agreement.[14]

Cleaver argues, however, that even if paragraph 9(a) is somehow spatially reasonable, its temporal scope of two years is unreasonable. Indeed, Cleaver argues that the two year time period was chosen arbitrarily by Uarco, that it is unreasonable on these facts, and that if the Court were to be lured into following the parenthetical language of the Salesman's Agreement "(or if this period shall be unenforceable by law, then for such period as shall be enforceable)" that this would be a misapplication of Indiana's blue pencil doctrine.

In reply, Standard Register contends that numerous Indiana cases have upheld a temporal restriction of two years or more, and

that the two year restriction here is "patently reasonable given that they are seeking to merely enforce a non-solicitation clause." (*See* Standard Register's Amended Proposed Findings of Fact and Conclusions of Law No. 22 at 24.) In any event, Standard Register argues that even if the two year restriction is unreasonable, the Court could still blue pencil in some other reasonable period.

■ The reasonableness of a time restraint in a restrictive covenant is generally judged using three criteria: its relation to the employer's protectable interest; the possible injury to the employee by precluding him from pursuing his occupation as a means of support; and whether it will interfere with the interests of the general public by depriving it of the restricted party's services. C .T. Drechsler, Annotation, *Enforceability of restrictive covenant ancillary to employment contract, as affected by duration of restriction,* 41 A.L.R.2d 15, 34 (1955).

As discussed *supra,* protection of an employer's customers is a legitimate basis for a covenant. *Id.* at 35. However, the mere opportunity of the employee to become acquainted with a customer does not determine the need, nor the duration of the protection, rather the personal relationship existing between the employee and the customer must be taken into account so as to indicate the likelihood that the employee would be able to take the customers of his employer when he leaves. *Id.* Generally speaking, the influence of the employee over the customers of his employer depends on the extent to which the customer identifies the employee with the business in hand and replaces the contact he would otherwise have with the employer with a personal relationship which binds him to the employee instead of to the employer's business. *Id.* This situation will occur most easily where the employee is the main, if not the sole, contact of the employer with the customer. *Id.* Salesmen, or "route men" most typically fall into this category. *Id.* "In all those instances, the employer's need for

---

14. Indiana's blue pencil doctrine allows for the striking out of invalid, but distinct and readily severable provisions so as to enforce valid ones. *Licocci,* 445 N.E.2d at 561. Blue penciling must be restricted to applying terms which already clearly exist in the contract. *Hahn v. Drees,*

*Perugini and Co.,* 581 N.E.2d 457, 462 (Ind.App. 1991). "Simply put, unreasonable restraints are rendered reasonable by scratching out any unreasonable clauses." *JAK Prods.,* 986 F.2d at 1087.

protection is very urgent, and a restrictive covenant will seldom be held unenforceable ... if the duration of the restraint does not exceed a period of time of approximately one to two years." *Id.* at 35–36.

■ An appropriate gauge by which to determine the length of time necessary for the protection of the employer's interests depends on the *period of time necessary to obliterate in the customer's mind the identification formed during the term of employment between the employer and the employee. Id.* at 36. In other words, the question is: "*After what period of time will the customer cease to be influenced by the personal relationship the employee was able to establish while in the employ of his employer?" Id.* In making this determination, an important factor is the frequency and regularity of the contact between the employee and the customer. *Id.* at 37. Thus, in the salesmen route cases, situations where the customer is visited frequently at relatively short intervals by the employee, courts are reluctant to approve durations of more than one or two years. *Id.* However, as to those salesmen who visit their customers with less regularity, and at longer intervals, the duration of the restraint may be substantially longer, *depending on the period of time usually elapsing between repeat orders. Id.*

■ Applying these concepts to the evidence in this case reveals that Cleaver was in frequent, indeed sometimes weekly, contact with his customers, monitoring their needs and fostering his personal relationship with them. This, of course, is precisely what both Uarco and Standard Register encouraged their salesmen to do: learn a customer's product line, talk to users of the documents in the various departments, and cultivate personal relationships with the decision-makers through entertainment and other means. Clearly, Cleaver has been successful in developing such personal relationships with his customers, most particularly HWI, such that upon leaving Standard Register he was able to switch the business to Prograde with virtually no drop-off. This result was achieved by virtue of the trust and confidence that HWI reposed in him (and in reality, in Uarco and Standard Register), an intangible factor that *can only be obtained after some considerable period of time.* Moreover, since HWI

and other customers use "test orders," a process sometimes requiring months of research and development by the salesman with the customer, order cycles largely become irrelevant. Much more important than simply knowing when a form is to be reordered is the knowledge of who will be using the form and how it flows through the customer's business. This knowledge can only be achieved through frequent contact with a customer's management and employees. Stated somewhat differently, it will take some time for Standard Register to insert another salesperson into the customer relationships that Cleaver previously enjoyed, such that the new salesperson can become acquainted with the needs and requirements of the customer so that he or she can suggest better, cheaper, or more efficient ways of conducting business through Standard Register's "value added" concept. It is therefore not unreasonable to suggest that that period of time will take at least two years under these circumstances. Indeed, Cleaver had considerably longer than that to build trusting customer relationships. Thus, it should be no surprise to learn that Indiana courts have found in similar salesman cases restrictive covenants of equal or longer duration to be reasonable. *Field,* 503 N.E.2d at 632; *4408, Inc.,* 373 N.E.2d at 902 (three years); *Rollins v. American State Bank,* 487 N.E.2d 842, 843–44 (Ind.App.1986) (five years); *Miller,* 202 N.E.2d at 398 (five years).

On the other hand, such a limited restraint as is set forth in paragraph 9(a) of the Salesman's Agreement would not be so substantial as to injure Cleaver in that he would only be precluded from soliciting or contracting with former entities to whom he had sold products during the year preceding his termination with Standard Register. Thus, Cleaver would be entirely free to sell to any other potential customers on behalf of Prograde. This highlights a critical distinction in the case trumpeted by Cleaver, *Uarco v. Slaven,* 97C1260, slip opinion (E.D.Wisc.1998). In that case, the court found the two year restriction on customer contact not to be unreasonable *per se. Id.* However, given the broad territorial restriction in paragraph 9(c) of the covenant that Uarco sought to enforce

there, the restrictive covenant actually sought to prohibit the former employee from "engaging in a broad variety of activities with large groups of individuals and entities" within Wisconsin; the upper peninsula of Michigan; Rockford, Illinois; and parts of the state of Iowa. *Id.* at 17–18. As a result, the covenant overall was deemed to be an unreasonable restriction. By contrast, the restrictive covenant sought to be enforced here would only go to a hand full of customers, leaving Cleaver free to develop a sales base wherever and among whomever he chooses. Given this narrow restraint, the interests of the general public should not be implicated.[15]

■■■■■ Fitting the foregoing analysis within the context of a motion for a preliminary injunction, the Court must determine if Standard Register enjoys a reasonable likelihood of success on the merits given the probable validity of the covenant now that it has been pared down to paragraph 9(a). In making that determination, the Court must at least find that Standard Register's chances are "better than negligible." *Kinney v. Int'l Union of Operating Eng'rs, Local 150,* 994 F.2d 1271, 1278 (7th Cir.1993). However, even if the suit appears to have some merit, it does not necessarily follow that an injunction should issue; the Court must still examine whether the harm an injunction would do to Cleaver substantially outweighs the harm that would occur to Standard Register if the injunction were denied. *MacDonald v. Chicago Park Dist.,* 132 F.3d 355, 357 (7th Cir.1997) ("the balance between the harm to the plaintiff if injunctive relief is denied and the harm to the defendant if it is granted is a critical consideration in deciding whether to grant a preliminary injunction.") (citing *Ayres v. City of Chicago,* 125 F.3d 1010, 1012 (7th Cir.1997)). "When the balance of harms tips so strongly in the defendant's favor, a stronger showing of likely success is required." *Id.* (citing *McKenzie v. City of Chicago,* 118 F.3d 552, 557 (7th Cir.1997)).

Given the foregoing analysis, it would appear that Standard Register has more than a negligible chance of success at trial, at least as to enforcing paragraph 9(a). This is particularly true since the covenant would be narrowly defined to the Cleaver's existing customer base.

■■■■ Having considered Standard Register's likelihood of success on the merits, the Court must now determine if the balance of harms weighs more heavily in favor of Standard Register or Cleaver. *Ayres,* 125 F.3d at 1012. In so doing, the Court will apply the Seventh Circuit's "sliding scale" approach, in which "the more likely it is the plaintiff will succeed on the merits, the less the balance of irreparable harms need weigh towards its side; the less likely it is the plaintiff will succeed, the more the balance need weigh towards its side." *Ram Prods., Inc. v. Chauncey,* 967 F.Supp. 1071, 1085 (N.D.Ind.1997) (quoting *Abbott Labs.,* 971 F.2d at 12). "The balance of harm analysis examines the harm of granting or denying the injunction upon the parties to the dispute as well as upon other interested parties, including the public." *Id.* (citing *Glenwood Bridge, Inc. v. City of Minneapolis,* 940 F.2d 367 (8th Cir.1991)).

■■■ Here, Standard Register contends that if an injunction is not issued, Cleaver will continue to sell Prograde products to HWI as well as to Cleaver's former Standard Register customers to its irreparable harm. As Judge Sharp has noted in such cases, there is no bright line rule as to such matters and the loss of customer good will can often amount to irreparable injury because the damages flowing from such loses are difficult to compute. *Ram Prods.,* 967 F.Supp. at 1086.

Applying these propositions to the prescribed legal matrix, we note that Standard Register certainly has some likelihood of success, at least as to paragraph 9(a), and it has demonstrated that without an injunction there will be a continuing loss of customer good will, an element that supports an element of irreparable harm. *Ram Prods.,* 967 F.Supp. at 1088. On the other hand, the harm to Cleaver is somewhat mitigated by the fact that he can develop a customer base

---

**15.** It is doubtful that paragraph 9(c) would be enforceable in Indiana. *See Hahn,* 581 N.E.2d at 461; *Seach,* 439 N.E.2d at 213–14. However, notwithstanding the views of the Slaven court, this provision can easily be blue penciled, allowing separate paragraph 9(a) to stand alone.

(apart from the customers already established) particularly given his apparent skill and knowledge in the arena of business forms sales. Thus, a limited preliminary injunction preventing him from soliciting or selling to those customers he formerly serviced within one year of his termination would affect his earning potential, but would not cause irreparable injury. Finally, while the Court must also consider the harm to others if an injunction were to issue, it would have a negligible effect here on the public given the narrow nature of the anticipated injunction.

 Finally, since a preliminary injunction will be granted, the Court must address the issue of security. Federal Rule of Civil Procedure 65(c) provides:

> No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant. . . .

This rule, makes security mandatory. *Gateway Eastern RR Co. v. Terminal Railroad Assoc. of St. Louis,* 35 F.3d 1134, 1141 (7th Cir.1994). However, the district court has discretion in determining the amount of the bond to be posted. *Id.* In this case, Cleaver is receiving from Prograde an annual salary of $140,000 as a draw on commissions. It can reasonably be anticipated that this case will proceed to trial within one year. Consequently, so as to fully secure Cleaver in the event that it is later determined that an injunction should not have issued, a bond will be set in the amount of $150,000 with a sufficient solvent surety to be approved by the Court.

### IV. CONCLUSION

Based on the foregoing, the Motion for a Preliminary injunction is hereby GRANTED. Pursuant to Fed.R.Civ.P. 65, Cleaver is hereby enjoined for a period of two years following the termination of his employment with Standard Register from contacting, with a view towards selling any product competitive with any products sold or proposed to be sold by Uarco or Standard Register at the time of the termination of Cleaver's employment, or actually selling, any such product to any person, firm, association or corporation to which Cleaver sold any product of Uarco or Standard Register during the year preceding the termination of his employment. Cleaver is

not to directly or indirectly make any such contact or sale either for the benefit of himself or the benefit of any other person, firm, association or corporation, and he is not to assist in any manner any person, firm, association or corporation to make such contact or sale. This injunction is binding upon the parties, their officers, agents, servants, employees and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise. This injunction shall not issue' until the Plaintiff gives security in the amount of $150,000 as provided, *supra.* SO ORDERED.