Timothy GLENN, Appellant–Defendant,

v.

**DOW AGROSCIENCES, LLC,**
Appellee–Plaintiff.

No. 06A01–0607–CV–278.

Court of Appeals of Indiana.

Feb. 2, 2007.

Adam Arceneaux, Michael T. McNally, Brian J. Paul, Brian E. Bailey, Ice Miller LLP, Indianapolis, IN, Attorneys for Appellant.

Kenneth R. Yerkes, Dwight D. Lueck, Richard P. Winegardner, Barnes & Thornburg LLP, Indianapolis, IN, Attorneys for Appellee.

## OPINION

CRONE, Judge.

### Case Summary

Timothy Glenn appeals the trial court's grant of a preliminary injunction in favor of Dow AgroSciences, LLC ("DAS"). We reverse.

### Issues

Glenn raises five issues, which we restate as follows:

I. Whether DAS's non-competition clause is unenforceable, thus precluding DAS from presenting a prima facie case to enjoin Glenn;

II. Whether, under Indiana's Uniform Trade Secrets Act ("UTSA"), DAS demonstrated that Glenn took affirmative action to misappropriate or threaten to misappropriate DAS trade secrets;

III. Whether the threatened injury to DAS outweighs the harm to Glenn resulting from the injunction;

IV. Whether the injunction serves the public interest; and

V. Whether the injunction was so broad and unclear as to prohibit Glenn from working in any position at Pioneer Hi–Bred International, Inc. ("Pioneer"), or for any other company in the agricultural industry.

Concluding that the first issue is dispositive, we do not specifically address the other issues.

### Facts and Procedural History

The evidence most favorable to the order granting the preliminary injunction is

as follows. In 1991, Glenn began working as a market research analyst in Pioneer's North America Marketing Department. Appellant's App. at 440. Over the next six years, Glenn received various promotions, sharpened his marketing skills, gained general industry knowledge, and developed management and negotiation abilities. *Id.* at 443. His positions gave him access to confidential Pioneer information, including sales, marketing strategies, research and development, profit/loss statements, production data, pricing data, and products. *Id.* at 440–42.

In 1997, Glenn left Pioneer to work at Mycogen Seeds ("Mycogen") as a senior product manager responsible for marketing Mycogen's corn products in the U.S. and Canada. *Id.* at 444. In 1998, Mycogen was acquired by DAS, a wholly owned subsidiary of the Dow Chemical Company, which provides pest management and biotechnology products to improve the quality and quantity of the food supply. Appellee's App. at 2, 3, 192, 444–45. DAS produces various seeds, with corn accounting for 80% of its total seed revenues. *Id.* at 2. DAS, through Mycogen, markets corn seed products across the United States in two ways: (1) branded sales; and (2) licensing, whereby it sells its traits and germplasm[1] for use in other companies' seed products. *Id.* at 5–7, 13–16, 204–06. DAS, the second leading company in the traits and germplasm licensing business and a technological leader, counts Pioneer among its principal competitors. *Id.* at 4–5, 13–14, 209, 260–61.

Glenn did not officially become a DAS employee until May 2000, at which time he was named a district sales manager in DAS's crop protection business in the Coastal States Business Unit. *Id.* at 445–47. It was then that Glenn was required to sign an employee agreement ("the Employee Agreement"), the relevant portions of which follow.

### Article 1—Confidential Information

Confidential Information means trade secrets, know-how, and other information, not generally known, relating to [DAS's] business which is disclosed to me or with which I become familiar during my term of employment with [DAS]. Confidential Information shall include information relating to [DAS's] business practices and prospective business interests, including, but not limited to, customer lists, forecasts, business and strategic plans, financial and sales information, products, processes, equipment, manufacturing operations, marketing programs, research, product development and engineering.

I shall not disclose to anyone or use; directly or indirectly, either during or after my employment, any Confidential Information of [DAS], except with the written consent of an officer of [DAS] or as required in my duties as an employee of [DAS]. This obligation shall continue unless and until such Confidential Information becomes generally known in the trade or industry without participation on my part.

The same obligation to protect Confidential Information shall apply to any information of any third party obtained by me as a[DAS] employee and with respect to which [DAS] has an obligation to maintain such in secrecy. Further, as a[DAS] employee, I shall not use or disclose to [DAS] any information of any previous employer or other third party to whom I have an obligation of secrecy, and I shall provide [DAS] with a copy of

---

1. A germplasm is the basic building block material of a seed that imparts characteristics such as standability, dryability, and yield. *See* Appellant's App. at 333–34.

any agreement I may have with a prior employer that affects my employment with [DAS].

Upon termination of employment, I shall surrender to [DAS] any and all items in my possession or control that constitute or contain Confidential Information and all other property of [DAS], such as documents, equipment, samples, cultures, and models.

. . . .

## Article 4—NonCompetition

I agree that, for a period of two years from the date of the termination of my employment with [DAS], I shall not, directly or indirectly, whether as owner, partner, officer, director, consultant, employee, or otherwise engage in or contribute my knowledge to any work or activity involving *an area of technology or business that is then competitive with a technology or business with respect to which I had access to Confidential Information during the five years immediately prior to such termination of my employment at [DAS]*. However, I shall be permitted to engage in such proposed work or activity, and [DAS] shall furnish me a written consent to that effect signed by an officer, if I shall have furnished to [DAS] clear and convincing written evidence, including assurances from me and my new employer, that the fulfillment of my duties in such proposed work or activity would not inevitably cause me to disclose, base judgments upon, or use any Confidential Information.

I further agree that, for said two-year period, I will inform any prospective employer, prior to accepting employment, of the existence of this Agreement and provide such prospective employer with a copy thereof.

I also agree that, for such two-year period, in addition to any obligations provided by law, I will not interfere with, disrupt or attempt to disrupt, the relationship, contractual or otherwise, with respect to the business carried on by [DAS] with any customer, supplier, lessor, lessee, licensor, licensee, or employee of [DAS].

Doc. Exs., Vol. I, Pl.'s Ex. 136 (emphasis added).

Glenn worked in a variety of positions at DAS over the next few years: sales manager for the Midwest Atlantic States Business Unit (2001); traits and germplasm licensing leader (2002); and sales and marketing leader for Mycogen Seeds in the U.S. (2005). Appellant's App. at 447–49, 336–37, 400–01, 450–53, 633. In this last role, Glenn oversaw preparation, development, implementation, and evaluation of DAS's marketing strategy for seed products for current and future years. Appellee's App. at 19–22, 33–35, 324–331. Working directly and continually with DAS business, operations, and research and development personnel, and being a member of high-level teams, Glenn admittedly had access to or working knowledge of various confidential DAS information. *See id.* at 134–53, 334–538. Such information included, but was not limited to, agreements with DAS's business partners, licensors and licensees, marketing plans, litigation with Pioneer, pedigrees for corn, pipeline development of new products, advancement plans, pricing strategies, etc. *Id.* Throughout Glenn's employment with DAS, the Employee Agreement was never altered, updated, or signed again. Appellant's App. at 449–51.

In November 2005, a recruiting firm, EFL & Associates ("EFL"), contacted Glenn regarding an opening for an operational marketing position at Pioneer. *Id.* at 366. EFL's solicitation included the

following description of the responsibilities of Director, North America Marketing Operations:

> ... lead and direct North America Marketing Operations. Key responsibilities include providing input to and implementation of long-term marketing strategy; directing responsibility for results within the immediate two-year timeframe to include pricing, programs, promotions, competitive/market analysis and product line management. He/she will serve as a key member of the North America leadership Team. The position reports to the Vice President and Business Director, North America Operations.

Appellee's App. at 268. Glenn indicated his interest in the Pioneer position, interviewed more than once, provided EFL with a copy of the Employee Agreement, and flagged the areas that might be of concern to DAS. Appellant's App. at 367–69, 459, 47. Apprised of the potential issues, Pioneer's legal department and others within Pioneer reviewed the Employee Agreement and ultimately concluded that Glenn could perform the Pioneer job without violating the agreement. *Id.* at 370–71, 429.

On April 1, 2006, Glenn received a written offer of employment from Pioneer; said offer was contingent upon Glenn obtaining written consent from DAS to accept the Pioneer position pursuant to the terms of the non-competition provision of the Employee Agreement. *Id.* at 374, 658–60; Appellee's App. at 92. Glenn received a revised offer,[2] dated April 10, 2006, that included a response date of April 18. Appellant's App. at 377. On April 10, Glenn informed Stan Howell, his direct supervisor at DAS, about the Pioneer job offer. *Id.* at 338, 376. After discussing the duties and responsibilities of the Pioneer position, Howell stated that he would need to consult with others about the Employee Agreement. *Id.* at 339, 378–79. Howell did consult with Jerome Peribere, DAS president, who thereafter spoke with Glenn, who was left with the impression that DAS would not "stand in the way" of his leaving. *Id.* at 341, 380.

Nevertheless, on April 17, 2006, Howell told Glenn that: (1) he thought the Pioneer position conflicted with Glenn's current DAS position; (2) Peribere did not mean to imply that DAS would not enforce its Employee Agreement; and (3) Glenn needed to contact DAS in-house counsel, Carrie Storer. *Id.* at 339–43, 379–82, 664–66. Storer informed Glenn that the question of whether DAS would enforce the Employee Agreement was ultimately a business decision to be determined by DAS's business leaders. *Id.* at 382. After meeting with Storer, Glenn sent to Howell and to DAS business leader Pete Siggelko an e-mail highlighting how Glenn's DAS job "contrasts with the potential opportunity with Pioneer." *Id.* at 664–66 (April 18, 2006 e-mail).

Via a phone call on April 19, 2006 and a letter dated April 20, 2006, Siggelko conveyed to Pioneer president and CEO Dean Oestreich that DAS would not consent to Glenn taking the Director, North America Marketing Operations position with Pioneer, that DAS would not object to Glenn accepting a different non-conflicting position, and that it requested a response by April 24, 2006, confirming the withdrawal of the offer. Appellee's App. at 226–30, 299. Pioneer's in-house counsel, Susan Bunz, responded by letter that the offer

---

**2.** The only revisions to the offer concerned relocation costs. Appellant's App. at 375, 661–63.

would not be withdrawn and that Glenn had informed Pioneer that DAS would waive the non-compete restrictions. *Id.* at 300. However, Glenn never did receive signed consent from DAS, felt "backed into a corner," and when compelled to decide whether to accept the Pioneer position or stay with DAS, Glenn indicated on April 24, 2006, that he would stay at DAS. *Id.* at 364–65, 386, 445.

On Tuesday, April 25, 2006, Glenn met with his personal attorney, who "believe[d]" there was "room to operate" regarding the Pioneer position and the Employee Agreement. *Id.* at 114–15. Glenn felt "much better" after speaking with the attorney, though he still believed that DAS "[wa]s going to try to make this ugly for [him.]" *Id.* On April 26, 2006, Glenn made up his mind to take the Pioneer position, and two days later, Pioneer agreed via e-mail to "cover any reasonable legal expenses incurred" if DAS sued. *Id.* at 115–16; Def. Ex. 108x. Glenn continued to work at DAS.

On May 1, 2006, Glenn signed and returned Pioneer's offer letter, but not before crossing out the language requiring DAS's written consent. Def. Ex. 95. Also on May 1, 2006, Glenn submitted to DAS a resignation letter, effective four days later, offering various assurances of nondisclosure and outlining some differences between Pioneer and DAS. Def. Ex. 130. The resignation letter also noted that Pioneer had provided written assurance to DAS that they understood Glenn's obligations to DAS, that Pioneer would "vigorously ensure" that the obligations were met, and that Pioneer had notified Glenn of disciplinary action/potential termination/civil liability should he use, even unwittingly, DAS confidential information. *Id.* Upon receiving Glenn's resignation, DAS requested that he continue working at DAS for two more days to assist in the transition of responsibilities to his successor. Appellant's App. at 469. Glenn began working at Pioneer on May 8, 2006.

On May 18, 2006, DAS filed a complaint and motion for preliminary injunction citing the Employee Agreement and the UTSA and requesting the trial court enjoin Glenn from taking the position of director, North America Marketing Operations for Pioneer or any other position that would call on him to use confidential DAS information acquired at DAS. Glenn filed his answer, affirmative and other defenses, and counterclaim against DAS. On June 16, 2006, DAS filed a pre-hearing brief in support of preliminary injunction. Glenn filed his pre-hearing brief in opposition to the preliminary injunction. On June 20 and 21, 2006, the trial court heard evidence on the motion for preliminary injunction. The parties each submitted proposed findings of fact, conclusions of law, and post-hearing briefs.

In a fifty-plus page order, issued June 30, 2006, the trial court granted the preliminary injunction. Among its 128 findings of fact and 70 conclusions of law, the order included the following:

100. It is suggested that the Court find that Glenn acted in bad faith. The Court declines to make that specific finding and instead finds that Glenn's actions in the last week were the result of one of two thought processes: It is true that Glenn may have been acting in bad faith. But it is also true, and much more likely in the estimation of this Court, that Glenn may have been laboring under a fog of confusion from delayed consultation with legal counsel, stress inherent in a major life change such as he was contemplating and frustration at receiving the answer "no"—albeit an answer that DAS was entitled to give under these circumstances. Many honest human beings and compe-

tent managers would comport themselves less than perfectly under these circumstances.

101. This Court will not make an unnecessary value judgment about Glenn's character, because whichever of the two scenarios is correct, and it is one or the other, DAS's proprietary information known by Glenn is in jeopardy of being used by Glenn in his position with Pioneer. If he acted in bad faith, then the threat to DAS is obvious. If he merely made poor decisions in a stressful week, that too leads to an inference that in the pressure of competing in the marketplace Glenn will find it impossible not to use what he knows, including DAS's proprietary information, to benefit Pioneer.

June 30, 2006 order, p. 28. Per that same order, the court enjoined Glenn from:

(a) performing the duties of Director, North America Marketing Operations, for Pioneer, or *any other position that would call upon him to use, directly or indirectly, DAS confidential information that he acquired while at DAS— this would include, without limitation, any job at Pioneer that involves the marketing of corn seed;*

(b) misappropriating, using, basing judgments upon, or disclosing DAS's trade secrets and confidential information for his benefit or for the benefit of any third party; and

(c) interfering with DAS's relationships with its customers, business partners, suppliers, licensors, licensees, or employees; and compelling Glenn to return all property belonging to DAS.

*Id.* at p. 58 (emphasis added). This appeal ensued.

## Discussion and Decision

### Standard of Review

■ Our standard of review in preliminary injunction cases is well settled:

The issuance of a preliminary injunction is within the sound discretion of the trial court, and the scope of appellate review is limited to deciding whether there has been a clear abuse of discretion. When determining whether or not to grant a preliminary injunction, the trial court is required to make special findings of fact and state its conclusions thereon. Ind. Trial Rule 52(A). When findings and conclusions are made, the reviewing court must determine if the trial court's findings support the judgment. The trial court's judgment will be reversed only when clearly erroneous. Findings of fact are clearly erroneous when the record lacks evidence or reasonable inferences from the evidence to support them. We consider the evidence only in the light most favorable to the judgment and construe findings together liberally in favor of the judgment.

The trial court's discretion to grant or deny preliminary injunctive relief is measured by several factors: (1) whether the plaintiff's remedies at law are inadequate thus causing irreparable harm pending the resolution of the substantive action if the injunction does not issue, (2) whether the plaintiff has demonstrated at least a reasonable likelihood of success at trial by establishing a prima facie case, (3) whether the threatened injury to the plaintiff outweighs the threatened harm the grant of the injunction may inflict on the defendant, and (4) whether, by the grant of the preliminary injunction, the public interest would be disserved. In order to grant a preliminary injunction, the moving party has the burden of showing, by a preponderance of the evidence, that the facts and circumstances entitle him to injunctive relief. *The power to issue a preliminary injunction should be used sparingly, and such relief should*

*not be granted except in rare instances in which the law and facts are clearly within the moving party's favor.*

*Hydraulic Exch. & Repair, Inc. v. KM Specialty Pumps, Inc.*, 690 N.E.2d 782, 785 (Ind.Ct.App.1998) (some citations omitted) (emphasis added); *see also Aberdeen Apts. v. Cary Campbell Realty Alliance, Inc.*, 820 N.E.2d 158, 163 (Ind.Ct.App. 2005), *trans. denied.* "If the movant fails to prove even one of these requirements, the trial court's grant of an injunction is an abuse of discretion." *Titus v. Rheitone*, 758 N.E.2d 85, 91 (Ind.Ct.App.2001), trans. denied. To the extent our review turns upon a question of law—such as contract interpretation—our standard of review is de novo. *See Oxford Fin. Group, Ltd. v. Evans*, 795 N.E.2d 1135, 1141–42 (Ind.Ct. App.2003).

■ Moreover, although a court is not prohibited from adopting "a party's proposed order verbatim, this practice weakens our confidence as an appellate court that the findings are the result of considered judgment by the trial court." *See Safety Nat'l Cas. Co. v. Cinergy Corp.*, 829 N.E.2d 986, 993 n. 6 (Ind.Ct.App.2005) (citing *Cook v. Whitsell–Sherman*, 796 N.E.2d 271, 273 n. 1 (Ind.2003)), *trans. denied.* Here, the trial court adopted in whole or in part 124 of the 127 findings proposed by DAS. Two of the findings *not* accepted by the trial court accused Glenn of not being "forthright" with DAS, "misleading" DAS, and acting in "bad faith" against DAS. *See* Appellant's App. at 247 (DAS proposed findings 99 and 100). The third finding suggested by DAS, but not incorporated by the trial court reads: "The April 27, 2006 silage meeting was not on Glenn's calendar. Glenn's usual practice was to electronically accept or decline proposed appointments that were sent to him via email. Thus, Glenn attended the meeting despite the fact that he had earlier specifi-cally declined a formal invitation to attend." *Id.* at 246 (DAS proposed finding 92).

## I. Non–Competition Clause

■ Glenn contends that without a geographic limitation or a customer-specific restriction, the non-competition clause of the Employee Agreement is presumptively void. Glenn maintains that absent a valid Employee Agreement, DAS could not make a prima facie case to enjoin him.

■ Agreements involving covenants not to compete are in restraint of trade and are not favored in the law. *See Harvest Ins. Agency v. Inter–Ocean Ins. Co.*, 492 N.E.2d 686, 688 (Ind.1986); *see also Dicen v. New Sesco, Inc.*, 839 N.E.2d 684, 687 (Ind.2005). Non-competition agreements are strictly construed against the employer and are to be enforced only if reasonable. *Press–A–Dent, Inc. v. Weigel*, 849 N.E.2d 661, 668–69 (Ind.Ct. App.2006), *trans. denied.* The issue of reasonableness is a question of law that rests upon facts gleaned from the totality of the circumstances. *See Ackerman v. Kimball Int'l, Inc.*, 652 N.E.2d 507, 510 (Ind.1995). Traditionally, it is the employer's burden to demonstrate that "the former employee has gained a unique competitive advantage or ability to harm the employer before such employer is entitled to the protection of a noncompetition covenant." *Cohoon v. Fin. Plans & Strategies, Inc.*, 760 N.E.2d 190, 194 (Ind.Ct.App. 2001).

■ In determining the reasonableness of the restrictions set forth in a noncompete covenant, this court must look at: (a) whether the restrictions are wider than is necessary for the protection of the covenantee in some legitimate interest; (b) the effect of the promise upon the covenantor; and (c) the effect upon the public. *Duneland Emergency Physician's Med. Group,*

*P.C. v. Brunk,* 723 N.E.2d 963, 966 (Ind. Ct.App.2000), *trans. denied.* Such covenants are deemed reasonable "only where the restraint is reasonably necessary to protect the employer['s interest], is not unreasonably restrictive of the employee and is not against public policy." *Ackerman,* 652 N.E.2d at 510.

### A. Legitimate Employer Interest

■■■■ In analyzing the first prong, we keep in mind the following:

An employer may not simply forbid his employee from subsequently operating a similar business. The employer must have an interest which he is trying to legitimately protect. There must be some reason why it would be unfair to allow the employee to compete with the former employer. The employee should only be enjoined if he has gained some advantage at the employer's expense which would not be available to the general public.

*Norlund v. Faust,* 675 N.E.2d 1142, 1154 (Ind.Ct.App.1997), *trans. denied.* For example, Indiana courts have held covenants not to compete valid when they protect an employer's interest in trade secrets or other confidential information, and when they protect the good will generated between a customer and a business. *See id.; see also Pathfinder Commc'ns Corp. v. Macy,* 795 N.E.2d 1103, 1110 (Ind.Ct.App.2003). To be clear, "an employee signing a restrictive covenant not to compete is entitled to utilize the general skills he has acquired in performing his job, and can only be prevented from doing so under circumstances where their use adverse to his employer would result in *irreparable injury.*" *Slisz v. Munzenreider Corp.,* 411 N.E.2d 700, 704 (Ind.Ct.App.1980) (emphases added).

Glenn admitted to having, over the preceding five years, access to or working knowledge of DAS confidential and highly confidential information in a variety of areas, including the following:

- DAS's 2006 and 2007 business and marketing plans;
- DAS's past research collaboration and litigation with Pioneer;
- DAS's pedigrees for corn;
- DAS's corn trait and germplasm licensing activities;
- DAS's pipeline development for new products;
- DAS's development of Nutritionally Enhanced Corn;
- DAS's research of drought tolerance for corn seed;
- DAS's 2006 hybrid corn production plan;
- DAS's national corn strategy;
- DAS's high-level strategic business and organizational plans, which included plans implicating Pioneer;
- DAS's pricing strategies and programs;
- DAS's structural alignment strategy; and
- DAS's advancement plans and process for its products in development.

Appellant's App. at 134–53, 334–432, 435–538. In addition, Glenn admitted that his knowledge of DAS's germplasm pedigrees constituted a trade secret. *Id.* at 134–53.

In light of the above, we cannot say that the lower court abused its discretion in concluding that DAS has a "strong and legitimate interest in protecting its trade secrets and highly confidential information relating to its corn seed business and technology from the public and, more importantly, from its competitors." June 30, 2006 order, p. 37. Again, protecting trade secrets and confidential business information from competitors and the public is hardly a new concept. *See Norlund,* 675 N.E.2d at 1154; *Pathfinder,* 795 N.E.2d at

1110; *see also Waterfield Mortg. Co. v. O'Connor,* 172 Ind.App. 673, 680, 361 N.E.2d 924, 927 (1977) (noting, "if an employee obtained confidential information, he may be restricted in the competitive use and disclosure of such information to the full extent of the employer's business which is thereby affected.").

### B. Scope of Restriction

 The second prong, concerning the covenant's effect on the employee, requires analysis of the scope of the agreement. "A covenant not to compete must be sufficiently specific in scope to coincide with only the legitimate interests of the employer and to allow the employee a clear understanding of what conduct is prohibited." *MacGill v. Reid,* 850 N.E.2d 926, 930 (Ind.Ct.App.2006). It must be reasonable in terms of time, geography, and types of activity prohibited. *Id.* at 933 (concluding that non-competition covenant was unreasonable because it went beyond scope of legitimate interest); *see Raymundo v. Hammond Clinic Ass'n,* 449 N.E.2d 276, 278 (Ind.1983) (upholding agreement that restricted competitive activity in "the general service area of the Clinic" for two years); *see Medical Specialists, Inc. v. Sleweon,* 652 N.E.2d 517, 523–24 (Ind.Ct. App.1997) (upholding agreement that restricted competitive activity for two-year period), *trans. denied; see also Washel v. Bryant,* 770 N.E.2d 902, 907–08 (Ind.Ct. App.2002); *cf. Dicen,* 839 N.E.2d at 689 (finding that employment covenant restricting employee "from working in the land remediation business anywhere in the United States for two years after he left" employer "exceeds the bounds of reasonableness"); *see Harvest,* 492 N.E.2d at 690 (noting "established rule that in most instances a spatial restraint upon a former employee must be limited to the area of the employee's sales territory.").

 As should be evident, analysis is dependent not merely upon the covenant itself but upon the entire contract and the situation to which it is related. *See Ackerman,* 652 N.E.2d at 510. Given that courts have often found two-year non-competition time limits reasonable, Glenn wisely does not challenge the temporal element of the non-competition clause. He does, however, take issue with the lack of geographic limitation and with the lack of customer-specific restriction.

Over thirty years ago, a panel of this court stated, "a covenant not to compete containing no spatial limitations is void and unenforceable." *Struever v. Monitor Coach Co.,* 156 Ind.App. 6, 8, 294 N.E.2d 654, 655 (1973). Since then, we have moderated the rule somewhat, stating, a "covenant without a geographic limitation *may* be reasonable *if* its reach is adequately limited by other means." *Vukovich v. Coleman,* 789 N.E.2d 520, 526 (Ind.Ct.App. 2003) (emphases added). Indeed, we have noted that as the specificity of limitation regarding the class of person with whom contact is prohibited increases, the need for limitation expressed in territorial terms decreases. *Seach v. Richards, Dieterle & Co.,* 439 N.E.2d 208, 213–15 (Ind.Ct.App. 1982) (rejecting as unenforceable portions of non-competition covenant concerning past and prospective clients).

Again, the "NonCompetition" article of the Employee Agreement signed by Glenn provides:

> I agree that, for a period of two years from the date of the termination of my employment with [DAS], I shall not, directly or indirectly, whether as owner, partner, officer, director, consultant, employee, or otherwise engage in or contribute my knowledge to any work or activity involving *an area of technology or business that is then competitive with a technology or business with respect to*

*which I had access to Confidential Information during the five years immediately prior to such termination of my employment at [DAS].*

However, I shall be permitted to engage in such proposed work or activity, and [DAS] shall furnish me a written consent to that effect signed by an officer, if I shall have furnished to [DAS] clear and convincing written evidence, including assurances from me and my new employer, that the fulfillment of my duties in such proposed work or activity would not inevitably cause me to disclose, base judgments upon, or use any Confidential information.

I further agree that, for said two-year period, I will inform any prospective employer, prior to accepting employment, of the existence of this Agreement and provide such prospective employer with a copy thereof.

*I also agree that, for such two-year period, in addition to any obligations provided by law, I will not interfere with, disrupt or attempt to disrupt, the relationship, contractual or otherwise, with respect to the business carried on by [DAS] with any customer, supplier, lessor, lessee, licensor, licensee, or employee of [DAS].*

Doc. Exs., Vol. I, Pl.'s Ex. 136 (emphases added).

■ Thus, the relevant question is whether the Non–Competition Article of the Employee Agreement, which contains no geographic limitation, is adequately limited by other means. The class of person with whom contact is prohibited includes any employer who would require Glenn to perform any work or activity involving an area of technology or business that is currently competitive with a technology or business with respect to which he "had access to Confidential Information during the five years immediately prior to" his departure from DAS. Presumably then, even if Glenn did not possess confidential information in certain areas, simply having access thereto would trigger the non-competition clause. In addition, the Non–Competition Article precludes Glenn from interfering with, disrupting, or attempting to disrupt business relationships between DAS and "any" of its customers, suppliers, lessors, lessees, licensors, licensees, or employee. This broadly worded restriction makes no distinction between past, current, or future customers, suppliers, lessors, etc.[3] They apparently all get caught within this wide net.

---

3. In *Seach,* the court found the contract divisible, rejected as unenforceable portions of the non-competition covenant concerning past and prospective clients, and thereby enforced reasonable limits. 439 N.E.2d at 214–15 (properly applying the blue pencil method). In contrast, the lower court here actually *changed* terms in the Employee Agreement. *Cf.* June 30, 2006 order, p. 58 (precluding Glenn from performing the Pioneer position "or any other position that would call on him to use, directly or indirectly, DAS confidential information that he *acquired* while at DAS") (emphasis added) with Pl.'s Ex. 136 (Employee Agreement's actual language bans Glenn from "directly or indirectly, whether as owner, partner, officer, director, consultant, employee, or otherwise engage in or contribute [his] knowledge to any work or activity involving an area of technology or business that is then competitive with a technology or business with respect to which [he] had *access* to Confidential Information during the five years immediately prior to such termination of [his] employment at [DAS]."). This judicial attempt to narrow the scope is not permissible because the parties did not agree to new terms. *See Burk v. Heritage Food Serv. Equip., Inc.,* 737 N.E.2d 803, 811 (Ind.Ct.App. 2000); *see also Dicen,* 839 N.E.2d at 689. Stated otherwise, a court may not, under the guise of interpretation, redraft a non-competition clause to make it more reasonable/narrower. *See Licocci v. Cardinal Assocs., Inc.,* 445 N.E.2d 556, 561 (Ind.1983).

Interestingly, the Employee Agreement does contain an "exception" to its ban. Specifically, if Glenn could have shown to DAS's liking, by "clear and convincing written evidence, including assurances from [Glenn] and [Pioneer], that the fulfillment of [Glenn's] duties in such proposed work or activity would not inevitably cause [him] to disclose, base judgments upon, or use any Confidential Information[,]" then DAS would have "permitted [him] to engage in such proposed work or activity, and [DAS would have furnished him] a written consent to that effect signed by an officer[.]" To that end, Glenn submitted his resignation letter, which provided as follows:

> .... Per Article 4 of the [DAS] Employee Agreement, I want to offer written assurance to [DAS] that I will be able to fulfill the duties of Director, North America Marketing Operations, for Pioneer in such a way that I will not disclose, base judgments upon or use any Confidential Information.
>
> While Pioneer and [DAS] compete in the same general market space, Pioneer utilizes a very different business model than [DAS]. Specific examples include, but are not limited to the following items:
>
> ■ Pioneer utilizes a proprietary distribution channel that has virtually no overlap or conflict with DAS' channel. Pioneer's channel is well established and will continue in much its present form into the future.
>
> ■ Pioneer operates a completely different business model of invoicing end-users across the majority of North America compared with DAS' practice of invoicing dealers/distributors. Pioneer's way of doing business is well established and will continue in much its present form into the future.

> ■ Pioneer utilizes proprietary research and development programs across its business. These programs develop products that compete in some of the same markets with DAS products, but there is virtually no chance of overlap of germplasm or genetic parents [sic?] utilized by Pioneer and DAS. The breeding programs for Pioneer are well established and will continue in much their present form in to the future.
>
> ■ Pioneer utilizes proprietary methods, processes and facilities for the production of its products. Pioneer's methods, processes and facilities are well established and will continue in much their present form into the future.
>
> Given the well established customer base, business practices, research & development and production capabilities of Pioneer, I am very confident that I will be able to complete all required duties for Pioneer without interfering or disrupting any customer, supplier, lessor, lessee, licensor, licensee or employee of [DAS].
>
> In addition, I want to offer assurance that I fully understand my obligations to protect DAS Confidential Information. I will not disclose to anyone or use, directly or indirectly, any Confidential Information of [DAS]. I agree to surrender all items in my possession or control that constitute or contain Confidential Information and all other property of [DAS].
>
> To further clarify my understating of these obligations to protect DAS' Confidential Information, I will absolutely not disclose, base judgments upon or use any Confidential Information in the following areas:

■ All matters related to the research collaboration between Pioneer and Mycogen.

■ All matters related to DAS/Mycogen strategy and capability from a commercial, operations and product development standpoint for seeds, traits and agricultural chemicals.

■ All matters related to DAS/Mycogen relationships with Monsanto, Syngenta, IFSI, SGI, BASF, Bayer, Forage Genetics, Stine, Beck's, CHS Marketing, UAP, Helena, Agriliance, Land O'Lakes, AC Humpko, or any other trait or technology supplier or business partner.

■ All matters related to DAS/Mycogen traits and germplasm licensing business.

■ All matters related to DAS/Mycogen sales and marketing strategies and tactic that are not obvious, collected through proprietary or 3rd party market research or disclosed to public sources by Mycogen/DAS/Dow employees or agents.

Def. Ex. 130.

Glenn's detailed resignation letter outlining how his new position would not violate the Non–Competition Article, as well as Pioneer's similar assurances, were to no avail. The hurdle erected by DAS was insurmountable. This is not surprising given the breadth of the non-competition clause. Not unlike the covenants at issue in *Vukovich* and *Struever*, the covenant before us "could apply to the entire world[.]" *See Vukovich*, 789 N.E.2d at 526 (citing *Struever*, 156 Ind.App. at 10, 294 N.E.2d at 656). Indeed, that was exactly what DAS argued for in its pre-hearing brief in support of preliminary injunction. *See* Appellant's App. at 99 (focusing on DAS's "worldwide operations," the "global corn markets," and its "national and international competitors"). Such an expansive scope severely restricts Glenn's ability to utilize the experience he has acquired during his career.

### C. Public Policy

■ ■ As for the third prong, which asks whether a contract is against public policy, we have noted that it is in the "best interest of the public that persons should not be unnecessarily restricted in their freedom [to] contract." *Sleweon*, 652 N.E.2d at 527. Yet, "a state has an interest in regulating the extent to which it will allow parties to restrain trade through the use of restrictive covanants[sic]." *Harvest*, 492 N.E.2d at 691. Moreover, "[b]ecause a covenant not to compete affects a person's ability to work, courts have historically viewed such covenants as impinging on public policy as well as affecting rights and duties between two parties." *Ohio Valley Commc'ns, Inc. v. Greenwell*, 555 N.E.2d 525, 528 (Ind.Ct.App.1990) (citations omitted).

More than a century ago, our supreme court stated: "A contract that would put it in the power of one party to prevent the other from carrying on his calling anywhere whatever is unreasonable." *Wiley v. Baumgardner*, 97 Ind. 66, 68 (1884). The Employee Agreement, under the circumstances presented here, infuses DAS with just such a power. That is, DAS effectively prevents Glenn from carrying on his calling. This it cannot do. *See Donahue v. Permacel Tape Corp.*, 234 Ind. 398, 411–12, 127 N.E.2d 235, 241 (1955) (noting that employer "has no right to unnecessarily interfere with the employee's following any trade or calling for which he is fitted and from which he may earn his livelihood and he cannot preclude him from exercising the skill and general knowledge he has acquired or increased through experience or even instructions while in the employment. Public policy prohibits such undue restrictions upon an

employee's liberty of action in his trade or calling."); *see also MacGill,* 850 N.E.2d at 932.

In sum, under these particular facts, while DAS's interest is legitimate, the restraint imposed by its Employee Agreement's NonCompetition Article is overly broad in scope and goes against public policy. *See Ackerman,* 652 N.E.2d at 510. In short, it is unreasonable. *See Dicen,* 839 N.E.2d at 689 (finding that employment covenant restricting employee "from working in the land remediation business *anywhere in the United States* for two years after he left" employer "exceeds the bounds of reasonableness"). In light of our conclusion that the non-competition provision here is unreasonable, it follows that DAS cannot establish a prima facie case. Therefore, the court exceeded its discretion when it issued the preliminary injunction. This was not a case where the "law and facts [were] clearly within the moving party's favor." *Hydraulic,* 690 N.E.2d at 785.

Reversed.

BAKER, J., and VAIDIK, J., concur.