**Ralph D. MILLSAPS, M.D., and Julio A. Morera, M.D., Appellants– Plaintiffs/Cross–Appellees,**

v.

**OHIO VALLEY HEARTCARE, INC., Appellee–Defendant/Cross– Appellant.**

No. 82A05–0603–CV–159.

Court of Appeals of Indiana.

April 13, 2007.

Patrick A. Shoulders, Robert L. Burkart, Allyson R. Breeden, Ziemer Stayman Weitzel & Shoulders, LLP, Evansville, IN, Attorneys for Appellants.

James D. Johnson, Stacy K. Harris, Rudolph, Fine, Porter & Johnson, LLP, Evansville, IN, Attorneys for Appellee.

## OPINION

BAKER, Chief Judge.

Appellants-plaintiffs/cross-appellees Ralph D. Millsaps, M.D., and Julio A. Morera, M.D. (collectively, appellants), appeal from the trial court's order enforcing the employment agreement (Agreement) in place between the appellants and appellee-defendant/cross-appellant Ohio Valley Heartcare, Inc. (OVHC), including the non-compete provision. In particular, the appellants raise a number of arguments, one of which we find dispositive, namely, that the trial court erred in finding that OVHC did not breach the Agreement by failing to provide timely and competent billing and collection services. OVHC cross-appeals, arguing that the trial court erred in finding that the appellants did not breach or threaten to breach the Agreement and, consequently, that OVHC is not entitled to attorney fees and costs. Finding that OVHC breached the Agreement and, consequently, is not entitled to enforce it against the appellants, we reverse the judgment of the trial court and remand with instructions to enter judgment in the appellants' favor on their declaratory action and for further proceedings consistent with this opinion.

## FACTS

OVHC is a cardiovascular medical practice with its primary location in Evansville. It employs physicians who provide cardiovascular medical services to OVHC's patients. Millsaps is one of two interventional cardiologists who founded OVHC; Morera was hired in 1991 as the practice's only pediatric cardiologist. Millsaps and Morera were directors, shareholders, and employees of OVHC. On January 1, 1998, the appellants signed the Agreement. The non-compete portion (Non–Compete) of the Agreement reads as follows:

9. *NON–COMPETITION.* During the term of this Agreement, *and for a period of two (2) years following the termination* of this Agreement, for any reasons whatsoever ..., *Physician shall not engage in the practice of medicine,* including, but not limited to, the furnishing of cardiovascular medical services, or otherwise compete directly or indirectly with the business of the Corporation within the "Restricted Area." ... For purposes hereof, *the "Restricted Area" shall consist of the following counties:*

Within the State of Indiana: Vanderburgh, Warrick, Gibson, Posey, Knox, Daviess, Sullivan, Green, Spencer, Pike, Dubois and Perry;

Within the State of Illinois: Gallatin, White, Edwards, Wabash, Lawrence, Crawford, Saline, Franklin, Williamson, Hamilton, Jackson, Union, Johnson and Hardin; and

Within the Commonwealth of Kentucky: Henderson, Daviess, Union, McLean and Webster.

The parties hereto stipulate and agree that the restrictions imposed by this Agreement are not in restraint of trade and are reasonable in terms of time, space, and the types of activity and conduct proscribed and prohibited hereby. In the event, however, that a court of competent jurisdiction should determine that any of said restrictions are unreasonable, then the Physician agrees that, in order to carry out the intent of the Physician and Corporation, the limitations that the court determines would be reasonable will be fully binding upon the Physician.

... In the event that Physician shall fail to comply with the provisions of this Paragraph 9, the Corporation and its successors and assigns shall be entitled to injunctive relief and to such further relief as may be proper and necessary to cause Physician to comply with the provisions of this Paragraph 9, including, without limitation, the right to an *ex parte* court order enjoining and restraining Physician from committing or continuing to commit any such violation. *In the event of a breach or threatened breach by Physician of this Paragraph 9, Physician promises and agrees to reimburse Corporation for all costs, expenses, and attorneys' fees incurred in the enforcement of Corporation's rights hereunder.* ...

\* \* \*

... The invalidity of all or any part of any section or subparagraph of this Paragraph 9 shall not render invalid the remainder of this Paragraph 9 or any section hereof.

Appellants' App. p. 73–74 (emphases added). While they were directors and shareholders of OVHC, the appellants supported the enforcement of the Non–Compete against other doctors leaving the practice.

In February 2005, Millsaps sent a letter to OVHC expressing concern about financial and management issues and requesting an audit. Following that letter, it was learned that there were problems with OVHC's billing and collection services and

that certain accounts receivable were not being attended to regularly. In 2004 and 2005, OVHC had failed to process nearly $2 million in patient billings, some of which were over two years old. This revelation resulted in the resignation or termination of OVHC's CEO, CFO, and billing chief, an increase in overhead to a monthly high of 83%, a reduction in physician compensation, inability to pay existing indebtedness, and an advisement from OVHC's accountant that the company was insolvent.

On August 15, 2005, Morera provided written notice of his resignation from OVHC, effective November 14, 2005. On September 13, 2005, Millsaps provided written notice of his resignation, effective November 14, 2005. During the six-month period ending on December 31, 2005, eight of seventeen physicians, including Millsaps and Morera, resigned from OVHC.

On September 14, 2005, the appellants filed a complaint against OVHC seeking a declaratory judgment that the Non–Compete was unreasonable and void as against Indiana public policy and seeking damages for breach of the Agreement. OVHC filed a counterclaim on September 29, 2004, seeking a declaratory judgment that the Non–Compete was enforceable and that there was a breach or threatened breach of the Non–Compete such that OVHC would be entitled to attorney fees and costs.

Following a trial that began on November 30, 2005, the parties each filed proposed findings of fact and conclusions of law on January 23, 2006. On February 22, 2006, the trial court entered its findings of fact and conclusions of law, which read, in pertinent part, as follows:

19. The Employment Agreements require OVHC to provide billing and collection services and at all times relevant to this case, OVHC has had an operating billing and collection department.

20. Millsaps expressed dissatisfaction with the performance of OVHC's billing and collection services in late 2004 and in 2005 prior to his withdrawal from OVHC.

21. In 2005, Millsaps notified OVHC's President, Dr. Larry Bucshon, that there were problems with OVHC's accounts receivable. Bucshon investigated and discovered that the amount of accounts receivable was much higher than was reported.... Bucshon convened a meeting of OVHC's Board and the CEO of OVHC was terminated....

22. OVHC's overhead has averaged between forty and fifty percent....

\* \* \*

25. In April of 2005, OVHC hired a new CFO, Karen Blesch....

26. ... OVHC reduced its accounts receivable over several months in 2005 and now its accounts receivable are generally within the national average for practices similar to OVHC.

\* \* \*

## II. CONCLUSIONS OF LAW

A. OVHC is entitled to have the covenants enforced against Millsaps and Morera as "blue penciled" by the Court consistent with the Court's Findings of Fact and Conclusions of Law herein.

B. OVHC has a legitimate protectable interest in the continued success of its business, the investments it has made in the development and maintenance of Millsaps' [s] and Morera's medical practices, and in OVHC's goodwill and its trust and personal relationships with its patients and referral sources.

C. The two[-]year time limit contained in the non-competition provision is reasonable.

D. The geographic limitations in OVHC's covenant are, however, patently overbroad and the Court exercises its authority to "blue pencil" that portion of the covenant.

E. The Court finds and concludes, based upon the evidence submitted, that a reasonable geographic area for enforcement of the covenant shall be limited to Vanderburgh, Posey, Gibson and Warrick Counties in Indiana and Henderson County in Kentucky.

F. The proscribed activity which states that the "physician shall not engage in the practice of medicine, including, but not limited to, the furnishing of cardiovascular medical services" of OVHC is overbroad and unreasonable. The term "the practice of medicine, including but not limited to" is removed from the covenants by the Court by use of the "blue pencil" doctrine.

G. As stated herein, the Court finds that public policy considerations may justify a review of Indiana's position concerning the enforcement of these covenants. This Trial Court, however, is bound to follow the law as it currently exists and, therefore, enforces the covenant as modified herein.

* * *

I. OVHC has complied with all its obligations pursuant to the non-competition clause and the Employment Agreements. It has not breached the Employment Agreements.

J. The Court concludes that Plaintiffs shall not be ordered to pay the attorney fees of OVHC for the reason that the Plaintiffs pursued their legal remedies in good faith and without breach or threatened breach of the covenant not-to-compete.

* * *

WHEREFORE this Court enters a declaratory judgment that the Employment Agreements, including the non-competition provisions, are enforceable against Millsaps and Morera as modified herein by the "blue pencil" doctrine. Each party shall bear its/their own costs.

Appellants' App. p. 18–30 (footnotes omitted). The appellants now appeal and OVHC crossappeals the trial court's determination that OVHC is not entitled to attorney fees and costs.

## DISCUSSION AND DECISION

The appellants raise a number of arguments, but we need address only one—that the trial court improperly found that OVHC did not breach the Agreement. As we consider this argument, we observe that at OVHC's request, the trial court entered findings of fact and conclusions of law, to which we apply the following standard of review:

> First, we determine whether the evidence supports the findings and second, whether the findings support the judgment. In deference to the trial court's proximity to the issues, we disturb the judgment only where there is no evidence supporting the findings or the findings fail to support the judgment. We do not reweigh the evidence, but consider only the evidence favorable to the trial court's judgment. Challengers must establish that the trial court's findings are clearly erroneous. Findings are clearly erroneous when a review of the record leaves us firmly convinced a mistake has been made. However, while we defer substantially to findings of fact, we do not do so to conclusions of

law. Additionally, a judgment is clearly erroneous under Indiana Trial Rule 52 if it relies on an incorrect legal standard. We evaluate questions of law de novo and owe no deference to a trial court's determination of such questions.

*Carmichael v. Siegel*, 754 N.E.2d 619, 625 (Ind.Ct.App.2001) (citations omitted).

■ But to the extent our review turns on a question of law—such as contract interpretation—our review is de novo. *Glenn v. Dow AgroSciences, LLC*, 861 N.E.2d 1, 8 (Ind.Ct.App.2007). The unambiguous language of a contract is conclusive on the parties to the contract and on the courts. *Orthodontic Affiliates, P.C. v. Long*, 841 N.E.2d 219, 222 (Ind.Ct.App. 2006). If the language of the instrument is unambiguous, the intent of the parties is determined from the four corners of that instrument. *Id.* In interpreting a written contract, we attempt to determine the intent of the parties at the time the contract was made as evidenced by the language used to express their rights and duties. *Id.* The contract is to be read as a whole and we will construe the language in a contract so as not to render any words, phrases, or terms ineffective or meaningless. *Id.*

■ The Agreement herein provides that "[a]ll billing and collection services will be provided by" OVHC. Appellants' App. p. 71. The income generated from physician billing and patient collections was used, in part, to compensate the OVHC physicians. The Agreement incorporated OVHC's Physician Policies and Procedures, which required the physicians to submit charge forms in a timely fashion for processing by the billing department and provided for the assessment of penalties, including delays in compensation, against physicians who failed to do so. OVHC undertook the "collection procedure" and communicated to its physicians

"[t]hat the earlier a charge is turned over, the more likely it will be paid." *Id.* at 215. It is apparent, therefore, that timeliness of billing and collection was of the utmost importance to OVHC. Moreover, OVHC's President acknowledged that "[o]versight of billing and collections was one of the major duties and responsibilities" of the CEO. Tr. p. 700.

On February 11, 2005, Millsaps sent a letter to OVHC's Board expressing concern about OVHC's financial status and management and requesting an audit. After the letter was distributed, the CFO and head of billing and collections resigned. Shortly thereafter, the CEO was terminated.

An inquiry revealed that "[t]here were issues relating to the billing department" that stemmed from OVHC's transition from one software program designed to manage billing and collections to another. *Id.* at 698. After the transition, the employees in the billing and collections department failed to continue to process the outstanding accounts receivable that remained in the old system and had not been transferred to the new system. In fact, in examining the accounts receivable in response to Millsap's concerns, OVHC learned that there were patient billings over two years old that had not been processed for collection. OVHC's CFO and President admitted that the problems with collection and billing were the result of OVHC's actions and inactions. *Id.* at 641, 698–700. As phrased by the appellants, "[t]he failure to bill and collect wasn't caused by a transition to electronic records but rather because OVHC forgot about the $1.7 million remaining on the old computer system." Appellants' Reply Br. p. 22.

Throughout 2004, OVHC reported to its physicians that the accounts receivable averaged between $4 million and $4.8 million. When the patient billings that had not

been processed were factored into the bottom line, however, that added nearly $2 million to the accounts receivable.

Upon comprehending the gravity of the situation, OVHC began to deal with the consequences of the disastrous errors of the billing and collections department. First, it required its physician shareholders to reduce their monthly draws by $5,000 for 22 months. Then, in June 2005, OVHC's accountant reviewed its balance sheet and concluded that OVHC was insolvent, had exhausted its line of credit, and was borrowing money and paying interest on it to compensate its physicians. The accountant also cautioned that "never before have we been this far in debt and still owe the profit sharing for the prior year." Appellants' App. p. 195. On September 30, 2005, Old National Bank sent Millsaps and Morera a notice as loan guarantors that OVHC was past due on its required loan payment.

In the midst of this financial crunch, OVHC was forced to increase its expenditures significantly. Among other things, the company was forced to retain its accountants and to hire several new temporary employees to deal with the billing problems. The increased expenditures caused OVHC's overhead percentage to increase substantially. In January 2005, OVHC's overhead skyrocketed to 83.47% from its previous two-year average of 50%; in April 2005, it was 70%, and in June 2005, it was 64%. The increase in overhead reduced available funds for payment of expenses and distribution to physicians. Although the appellants acknowledge that there is no requirement in the Agreement to maintain a specific overhead percentage, they emphasize that the skyrocketing overhead is just another financial consequence of the overlooked accounts.

■ OVHC insists that its failure to provide billing and collection services in a competent and timely manner was only temporary and that, once the problem was discovered, OVHC took various steps to rectify the situation. Initially, we note that a breach is a breach—even if temporary, and even if it is later rectified. A "temporary" breach is no less a breach than a "permanent" one. Moreover, the accounts receivable that OVHC overlooked dated back two years, which is far from a "temporary" problem in a workplace that holds a philosophy of "the sooner, the better" with respect to billing. Finally, we observe that during the six-month period ending on December 31, 2005, eight of seventeen physicians resigned from OVHC, which is a fact that substantially undercuts any argument attempting to minimize the significance of OVHC's financial woes.

As for the past due bank note, OVHC contends that the letter was sent mistakenly and that the note was ultimately paid off. OVHC insists that although the appellants "might not be happy with a month of high overheard [sic] or the mistaken letter, neither amounts to a breach of the Employment Agreements." Appellee's Br. p. 31. The notice from the bank indicates, however, that the payment due date was September 20, 2005. OVHC's CFO testified that as of the date of the late notice—September 30, 2005—OVHC had not written the check to pay off the past due loan. Supp.App. p. 54–55. Thus, whether or not OVHC ultimately paid off the loan, as of September 30, 2005, its payment was overdue.

OVHC next highlights that during the period of time in question, Millsaps and Morera were directors and shareholders of OVHC. Consequently, OVHC contends that the appellants had the responsibility to ensure that the company was run to their satisfaction and that it is "disingenuous . . . to complain about the management

of OVHC when they themselves had control over the business." *Id.* at 31. As aptly and logically pointed out by the appellants, however, it was *only because* Millsaps raised questions about OVHC's financial affairs that the problems were discovered at all. Millsaps also vociferously requested an audit, but OVHC refused to comply with that request. Moreover, the appellants note that oversight of billings and collections was the responsibility of the CEO, not of the physician directors. Finally, they note that OVHC provided incorrect financial information to the shareholders that did not take into account the nearly $2 million in accounts receivable remaining on the old system.

Finally, OVHC argues that the appellants contributed to the company's financial situation by overdrawing their shares, insisting that "[w]ithout the physician overdraws OVHC would have been profitable" during the relevant period of time. Appellee's Br. p. 32. The appellants insist, however, that if OVHC had timely and adequately billed and collected the nearly $2 million in lost receivables, physicians would not have been overdrawn, draws would not have had to have been lowered, and additional debt would not have to have been incurred. Indeed, OVHC presented no evidence that the draws of any physician in 2005 were any different than they had been for the prior fifteen years.

OVHC does not contest that it was required, as a material term of the Agreement, to provide timely and competent billing and collection services. Nor does it contest that its billing and collection practices were inconsistent with the Agreement, other than to highlight the allegedly "temporary" nature of the problem and the remedial measures taken to fix it. Under these circumstances, we can only conclude that OVHC breached the Agreement by failing to provide timely and competent billing and collection services. Consequently, it may not enforce the Agreement against the appellants and we need not address the validity of the Non–Compete or OVHC's argument that it is entitled to attorney fees and costs pursuant to the Agreement. *See Sallee v. Mason,* 714 N.E.2d 757, 763 (Ind.Ct.App.1999) (holding that employee is not required to abide by noncompete when employer first committed a material breach of the employment agreement); *Licocci v. Cardinal Assocs., Inc.,* 492 N.E.2d 48, 52 (Ind.Ct.App.1986) ("[a] party first guilty of a material breach of contract may not maintain an action against the other party or seek to enforce the contract against the other party should that party subsequently breach the contract").

The judgment of the trial court is reversed and remanded with instructions to enter judgment in favor of the appellants on their declaratory action and for further proceedings consistent with this opinion.

DARDEN, J., and ROBB, J., concur.