**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEYS FOR APPELLANTS:

**MARIELENA DUERRING**
Duerring Law Office
South Bend, Indiana

ATTORNEYS FOR APPELLEE:

**SHARON R. ALBRECHT**
Indiana Department of Child Services
South Bend, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of C.S., Jr., D.S., and J.S., minor children, and C.S., Sr., father: | ) ) ) ) | |
| C.S., Sr., | ) ) | |
| Appellant-Respondent, | ) ) | |
| vs. | ) ) | No. 71A04-1111-JT-641 |
| INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) | |
| Appellee-Petitioner. | ) | |

APPEAL FROM THE ST. JOSEPH PROBATE COURT
The Honorable Peter J. Nemeth, Judge
Cause No. 71J01-1106-JT-72, -73, and -74

**August 15, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**KIRSCH, Judge**

C.S., Sr., ("Father"), appeals the involuntary termination of his parental rights to his children, challenging the sufficiency of the evidence supporting the trial court's judgment. We affirm.

## FACTS AND PROCEDURAL HISTORY

Father is the biological father of C.S, Jr. ("C.S."), born in January 2007, D.S., born in July 2008, and J.S., born in December 2009. The facts most favorable to the trial court's judgment reveal that in December 2008, C.S. was removed from the child's mother[1] after the local St. Joseph County office of the Indiana Department of Child Services ("DCS") confirmed a report that eleven-month-old C.S. had been discovered wandering outside alone for fifteen to thirty minutes wearing only a diaper and t-shirt. The weather conditions at the time C.S. was found were "negative two (2) degrees Fahrenheit with wind gusts up to twenty-one (21) miles an hour." *Appellant's Appendix* at 10. In addition, DCS received a second referral the same day alleging there was no food or electricity in the family home and that the children's mother and other relatives who lived in the home used illegal drugs.

During an assessment that same day, DCS case managers visited the family home and observed holes in the ceiling, dirty clothes scattered across the floors, and two electrical heaters, along with the stove, being used to heat the family home despite a known gas leak. Mother denied using drugs. Mother's own father admitted to using marijuana, but declined to take a drug screen. In addition, an older half-sibling of C.S. and D.S. was interviewed and disclosed additional information concerning the lack of

---

[1] The children's biological mother, A.C. ("Mother"), does not participate in this appeal. We therefore limit our recitation of the facts to those pertinent solely to Father's appeal.

supervision and drug use in the family home. As a result of its assessment, including the circumstances surrounding C.S.'s removal earlier the same day and the existence of several previous life and heath endangerment referrals involving the family, DCS decided to remove D.S. and the older half-sibling from Mother's care as well. D.S. was placed together in foster care together with C.S.[2] At the time of the children's removal, Father was incarcerated on drug-related convictions and unavailable to parent the children.

The children were subsequently adjudicated children in need of services ("CHINS") and the children's biological mother began participating in court-ordered reunification services while Father remained incarcerated. Although Father was released in March 2009, shortly thereafter he was again incarcerated, this time in the State of Michigan, on additional drug-related charges. The record does not disclose the exact nature of the new charges, however, nor was Father's actual release date indicated. Nevertheless, Father did not become actively involved in the CHINS cases involving C.S. and D.S. until March 2010. Meanwhile, J.S. was born in December 2009.

Father's initial hearing on the CHINS petitions as to C.S. and D.S. was held on March 3, 2010. Following the hearing, the trial court adjudicated C.S. and D.S. CHINS and proceeded to disposition the same day. The trial court thereafter entered a dispositional order formally removing both children from Father's care and directing Father to participate in and successfully complete a variety of tasks and services designed to improve his parenting skills and to facilitate reunification. Among other things, Father was ordered to: (1) establish paternity of the children; (2) obey the law; (3) abstain from

---

[2] For clarification purposes we note that the children's older half-sibling was placed with that child's biological father and is not a subject of this appeal.

the use of illegal drugs and alcoholic beverages; (4) submit to random drug screens; (5) maintain a legal and regular source of income; (6) obtain and maintain adequate housing; (7) participate in family and individual counseling and follow all recommendations; and (8) pay weekly child support for each child.

By August 2009, J.S had also been removed from Mother's care. Although Father had not yet established paternity of J.S., he admitted to the allegations of the CHINS petition pertaining to J.S. during an initial hearing in the matter, and the child was so adjudicated. A dispositional hearing pertaining to J.S. was held in September 2010, and the trial court later entered a nearly identical dispositional order as was entered in the cases involving C.S. and D.S., with the added requirements that Father take any and all medications as prescribed and that Father successfully complete the drug treatment and aftercare program in which he was currently engaged.

Father's participation in reunification services throughout the CHINS case was inconsistent and was replete with periods of compliance followed by periods of non-compliance. For example, when Father first began participating in the CHINS case, he tested positive for marijuana and was observed by service providers to smell like alcoholic beverage and/or marijuana during several visits with the children. Although Father began participating in a substance abuse treatment program and subsequent drug tests indicated Father was no longer using these illegal substances, Father began using the prescription drug Tramadol, a narcotic, for back pain which case workers and service providers reported negatively affected Father's personality and demeanor when interacting with the children and service providers. Despite being asked by DCS to

4

change his medication, Father went back to using the Tramadol and therefore was asked to restart the drug treatment program.

In addition, although Father obtained housing for himself with Hope Ministries in October 2010 and later obtained a family unit at the Hope Family Life Center in February 2011, he was officially terminated from the program and lost all housing in August 2011 for non-participation. Similarly, Father obtained employment at a Goodwill Store in June 2011, but had stopped working by August 2011 and remained unemployed and dependent upon his sister for housing for the remainder of the underlying proceedings. Father also was arrested and incarcerated several times throughout the CHINS and termination cases on various charges including violation of probation, driving while suspended, and operating a vehicle while intoxicated.

As for visitation, although Father attended over one hundred scheduled visits with the children, the visits were oftentimes chaotic and never progressed to unsupervised visits. In addition, Father was late for approximately thirty (30) of the visits, oftentimes forgot to bring snacks and/or meals for the children as required, fell asleep and/or struggled to stay awake during several visits, and oftentimes was unable to properly supervise all three children at the same time necessitating repeated intervention and redirection by visitation supervisors.

DCS eventually filed petitions seeking the involuntary termination of Father's parental rights to the children in June 2011.[3] A consolidated evidentiary hearing on all three termination petitions was later held in November 2011. During the termination

---

[3] The mother's parental rights were involuntarily terminated by the trial court in August 2010.

hearing, DCS presented evidence establishing that the circumstances resulting in the children's removal and continued placement outside Father's care remained largely unchanged. Although Father had completed several of the court-ordered reunification services, including parenting classes and substance abuse treatment, he was unable to demonstrate that he had benefitted from these services and was now able to provide the children with a safe and stable environment on his own. Moreover, at the time of the termination hearing, Father remained unemployed, did not have independent housing, and had paid only $27.00 total in child support for all three children for the duration of the nineteen-month case. Finally, DCS presented evidence showing C.S., D.S., and J.S. had been living together and thriving in relative foster care with Father's cousin who was meeting all the children's needs and who wished to adopt all the children should the court decide to grant DCS's termination petitions.

At the conclusion of the termination hearing, the trial court took the matter under advisement. On November 14, 2011, the trial court entered its judgments terminating Father's parental rights to all three children. Father now appeals.

**DISCUSSION AND DECISION**

When reviewing a termination of parental rights case, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment

6

terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*.

Here, in terminating Father's parental rights, the trial court entered specific findings and conclusions. When a trial court's judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. *L.S.*, 717 N.E.2d at 208.

The "traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. These parental interests, however, are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights. *Id.* In addition, although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *In re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001).

Before an involuntary termination of parental rights may occur in Indiana, the State is required to allege and prove, among other things:

(B)     that one (1) of the following is true:

    (i)     There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

    (ii)     There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child. . . .

Ind. Code § 31-35-2-4(b)(2).[4]   The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting Ind. Code § 31-37-14-2).   Moreover, if the trial court finds that the allegations in a petition described in Indiana Code section 31-35-2-4 are true, the court *shall* terminate the parent-child relationship.   Ind. Code § 31-35-2-8(a).   Here, Father challenges the sufficiency of the evidence supporting the trial court's findings as to subsection (b)(2)(B) of the termination statute cited above.   *See* Ind. Code § 31-35-2-4(b)(2).

To properly effectuate the termination of parental rights under Indiana Code section 31-35-2-4(b)(2)(B), a trial court need only find that one of the three requirements of subsection (b)(2)(B) has been established by clear and convincing evidence.   *See e.g., L.S.*, 717 N.E.2d at 209.   Here, the trial court determined that the first two elements of subsection (b)(2)(B) had been established.   Because we find it to be dispositive under the facts of this case, however, we shall only discuss whether DCS established, by clear and convincing evidence, that there is a reasonable probability the conditions resulting in the

---

[4]   We observe that Indiana Code section 31-35-2-4 was amended by Pub. L. No. 48-2012 (eff. July 1, 2012).   The changes to the statute became effective after the filing of the termination petition involved herein and are not applicable to this case.

children's removal or continued placement outside of Father's care will not be remedied. *See* Ind. Code § 31-35-2-4(b)(2)(B)(i).

When making such a determination, a trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied.* The court must also "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." *Id.* Pursuant to this rule, courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *A.F. v. Marion Cnty. Office of Family & Children*, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied.* The trial court may also consider any services offered to the parent by the county department of child services and the parent's response to those services, as evidence of whether conditions will be remedied. *Id.* Moreover, DCS is not required to provide evidence ruling out all possibilities of change; rather, it need establish only that there is a reasonable probability the parents' behavior will not change. *In re Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007).

On appeal, Father admits that the trial court's findings of fact "arguably were supported by sufficient evidence." *Appellant's Brief* at 3. Nevertheless, Father asserts that these facts were "purely historical." *Id.* Father further complains that the trial court completely ignored Father's "current circumstances" and "evidence of changed conditions." *Id.* at 3-4.

In terminating Father's parental rights, the trial court specifically found that Father was "inconsistent in attending visitations with his children," "broke the rules at Hope Ministries" regarding "curfew" and attending meetings "as requested," and failed to arrange for the correct amount of bus passes in order to attend DCS case meetings. *Appellant's Appendix* at 6. The court further found that Father was "removed" from his drug treatment program because of his "belligerent attitude," that he "stopped going to his therapy sessions in June 2011[,] and was terminated from that program in August 2011," and that he was incarcerated both when the children were first removed from their mother and again in July 2011 when Hope Ministries held a meeting and determined to terminate Father from their program. *Id.* Based on these and other findings, the trial court determined that there is a reasonable probability the conditions resulting in the children's removal and continued placement outside Father's care will not be remedied.

Our review of the record leaves us convinced that ample evidence supports the trial court's findings cited above. At the time of the termination hearing, Father's circumstances remained largely unchanged. Specifically, Father continued to be unemployed, did not have independent housing, and had ceased attending individual counseling sessions approximately two months before DCS cancelled the referral. As for visitation, Father had failed to consistently demonstrate the parenting skills he had been taught while visiting with the children and was never able to progress to unsupervised visits. Additionally, Father was incarcerated on new criminal charges several times during the underlying proceedings. Although Father does appear to have maintained his sobriety for several months leading up to the termination hearing, his habitual pattern of

10

conduct in achieving periods of compliance and sobriety, followed by periods of non-compliance and drug use, calls into question Father's long-term ability to properly care for the children and to maintain a safe and stable home environment, all of which further supports the trial court's ultimate determination that there is a reasonable probability the conditions resulting in the children's removal from Father's care will not be remedied.

During the termination hearing, Court Appointed Special Advocate Thomas Beck recommended termination of Father's parental rights. When asked to describe his "feelings" about "this case" and "termination," Beck answered:

> I think [Father's] a good human being overall, but the problem is that he's very immature in terms of being able to accept responsibilities for himself let alone for three children, and I don't think he's at the stage of life at this point in time where he could handle three children because his own life is in such disarray . . . . I dealt with him for 19 months and there hasn't been a three month period during that time where he hasn't had some serious issue crop up; that had he had custody of the children, he would have either put them in jeopardy, actual physical jeopardy[,] or they would have ended up back in a foster home.

*Transcript* at 31-32. Beck went on to confirm that Father had "two DUI arrests" during the underlying proceedings, "falsely identified himself" and was later arrested after being in an accident, failed the first court-ordered drug treatment program, and within two weeks of starting the second program "took two drugs that had potentially fatal drug interaction implications. . . ." *Id.* at 32. Although Beck indicated that during the three months leading up to the termination hearing the visits between Father and the children had "gone very well" overall, Beck nevertheless testified that these recent visits had also been "very, very up and down," explaining that Father would have an "excellent" visit where he would be "on time," and "bring the right food," and then the very next visit

Father "might not show up at all or if he did, he didn't show up with the right food[,] or no food . . ." *Id.* at 33-34 DCS case manager Sarah Henry ("Henry") likewise recommended termination of Father's parental rights. In so doing, Henry reported that Father's last individual counseling session was in June 2011 and that he had voluntarily quit going two months before services were terminated. Henry also confirmed that Father was unemployed, did not have independent housing, and had only paid "[a] total of three [child support] payments for a total of $27.00." *Id.* at 82. Henry went on to testify that although Father's visits with the children had "gone better" recently, Father had "still been late, even as most recent[ly] as September 29[th] he was late and did not come prepared with food for the children." *Id.* at 75. When asked, "[W]hat conditions exist today in this case that are different or similar to what it was like when [DCS] took the children," Henry answered, "My concern with [Father] is still just being able to meet the children's day[-]to[-]day needs. If you can't attend a once a week visit on time with food for a two-hour visit . . . how can I feel comfortable putting three children in your care[?]" *Id.* at 54.

As noted earlier, a trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child. *D.D.*, 804 N.E.2d at 266. "A pattern of unwillingness to deal with parenting problems and to cooperate with those providing services, in conjunction with unchanged conditions, supports a finding that there exists no reasonable probability that the conditions will change." *Lang v. Starke Cnty. Office of Family & Children*, 861 N.E.2d

12

366, 372 (Ind. Ct. App. 2007), *trans. denied*. Moreover, we have previously explained that "simply going through the motions of receiving services alone is not sufficient if the services do not result in the needed change." *In re J.S.*, 906 N.E.2d 226, 234 (Ind. Ct. App. 2009). Here, for approximately nineteen months, Father has demonstrated a persistent unwillingness and/or inability to refrain from criminal activity and to take the actions necessary to show that he is capable of providing the children with the safe and stable home environment they need. Father's arguments on appeal emphasizing his purported change in circumstances, rather than the evidence cited by the trial court in its findings, amounts to an impermissible invitation to reweigh the evidence. *See e.g. D.D.*, 804 N.E.2d 258. We therefore find no error.

Affirmed.

BAKER, J., and BROWN, J., concur.